# Syllabus

Chief Justice:
Bridget M. McCormack

Chief Justice Pro Tem:
David F. Viviano

Justices:
Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

Reporter of Decisions:
Kathryn L. Loomis

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

*In re* CERTIFIED QUESTIONS FROM THE UNITED STATES DISTRICT COURT, WESTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION (MIDWEST INSTITUTE OF HEALTH, PLLC v GOVERNOR)

Docket No. 161492. Argued on request to answer certified questions September 9, 2020. Decided October 2, 2020.

Midwest Institute of Health, PLLC; Wellston Medical Center, PLLC; Primary Health Services, PC; and Jeffery Gulick brought an action in the United States District Court for the Western District of Michigan against the Governor of Michigan, the Michigan Attorney General, and the Michigan Department of Health and Human Services Director, challenging the Governor's Executive Order (EO) No. 2020-17, which prohibited healthcare providers from performing nonessential procedures. The order was issued by Governor Gretchen Whitmer as part of a series of executive orders issued in response to the COVID-19 pandemic. On March 10, 2020, the Governor issued EO 2020-04, declaring a "state of emergency" under the Emergency Powers of the Governor Act of 1945 (the EPGA), MCL 10.31 *et seq.*, and the Emergency Management Act of 1976 (the EMA), MCL 30.401 *et seq.* On April 1, 2020, she issued EO 2020-33, which declared a "state of emergency" under the EPGA and a "state of emergency" and "state of disaster" under the EMA. She then requested that the Legislature extend the state-of-emergency and state-of-disaster declarations by 70 days. In response, the Legislature adopted Senate Concurrent Resolution 2020-24, extending the state of emergency and state of disaster through April 30, 2020. On April 30, 2020, the Governor issued EO 2020-66, which terminated the declaration of a state of emergency and state of disaster under the EMA. But, immediately thereafter, she issued EO 2020-67, which indicated that a state of emergency remained declared under the EPGA. At the same time, she issued EO 2020-68, which redeclared a state of emergency and state of disaster under the EMA. Plaintiffs in the underlying federal case are healthcare providers that were prohibited from performing nonessential procedures while EO 2020-17 was in effect and a patient who was unable to undergo a knee-replacement surgery that had been scheduled for the end of March. Although EO 2020-17 has been rescinded, the federal district court held that the case is not moot because subsequent executive orders have continued to impose restrictions on healthcare providers. The federal court further determined that certain issues raised in the case involved unsettled areas of state law such that certification of those questions to the Michigan Supreme Court was appropriate. The federal district court certified the following questions to the Michigan Supreme Court:

1. Whether, under the Emergency Powers of the Governor Act, MCL § 10.31, *et seq.*, or the Emergency Management Act, MCL § 30.401, *et seq.*, Governor Whitmer has the authority after April 30, 2020 to issue or renew any executive orders related to the COVID-19 pandemic.

2. Whether the Emergency Powers of the Governor Act and/or the Emergency Management Act violates the Separation of Powers and/or the Non-Delegation Clauses of the Michigan Constitution.

The Michigan Supreme Court ordered and heard oral argument on the certified questions. 505 Mich ___ (2020).

The Michigan Supreme Court, in opinions by Justice MARKMAN, Chief Justice McCORMACK, Justice VIVIANO, and Justice BERNSTEIN, unanimously *held*:

The first certified question is partially answered in the negative: The Governor did not have authority after April 30, 2020, to issue or renew any executive orders related to the COVID-19 pandemic under the EMA.

The Michigan Supreme Court, in an opinion by Justice MARKMAN joined in full by Justices ZAHRA and CLEMENT and joined as to Parts III(A), (B), (C)(2), and IV by Justice VIVIANO, further *held*:

The second certified question is partially answered in the affirmative: The Governor did not possess the authority to exercise emergency powers under the EPGA because the act unlawfully delegates legislative power to the executive branch in violation of the Michigan Constitution.

Justice MARKMAN, joined by Justices ZAHRA and CLEMENT, concluded that the Governor lacked the authority to declare a "state of emergency" or a "state of disaster" under the EMA after April 30, 2020, on the basis of the COVID-19 pandemic and that the EPGA violated the Michigan Constitution because it delegated to the executive branch the legislative powers of state government and allowed the executive branch to exercise those powers indefinitely. First, under the EMA, the Governor only possessed the authority or obligation to declare a state of emergency or state of disaster once and then had to terminate that declaration when the Legislature did not authorize an extension; the Governor possessed no authority to redeclare the same state of emergency or state of disaster and thereby avoid the Legislature's limitation on her authority. Second, regarding the statutory language of the EPGA, plaintiffs' argument that an emergency must be short-lived and the Legislature's argument that the EPGA was only intended to address local emergencies were textually unconvincing. And while the EPGA only allows the Governor to declare a state of emergency when public safety is imperiled, public-health emergencies such as the COVID-19 pandemic can be said to imperil public safety. Third, as the scope of the powers conferred upon the Governor by the Legislature becomes increasingly broad, in regard to both the subject matter and their duration, the standards imposed upon the Governor's discretion by the Legislature must correspondingly become more detailed and precise. MCL 10.31(1) of the EPGA delegated broad powers to the Governor to enter orders "to protect life and property or to bring the emergency situation within the affected area under

control," and under MCL 10.31(2), the Governor could exercise those powers until a "declaration by the governor that the emergency no longer exists." Thus, the Governor's emergency powers were of indefinite duration, and the only standards governing the Governor's exercise of emergency powers were the words "reasonable" and "necessary," neither of which supplied genuine guidance to the Governor as to how to exercise the delegated authority nor constrained the Governor's actions in any meaningful manner. Accordingly, the EPGA constituted an unlawful delegation of legislative power to the executive and was unconstitutional under Const 1963, art 3, § 2, which prohibits exercise of the legislative power by the executive branch. Finally, the unlawful delegation of power was not severable from the EPGA as a whole because the EPGA is inoperative when the power to "protect life and property" is severed from the remainder of the EPGA. Accordingly, the EPGA was unconstitutional in its entirety.

Justice VIVIANO, concurring in part and dissenting in part, joined Justice MARKMAN's opinion to the extent that it concluded that the certified questions should be answered, held that the Governor's executive orders issued after April 30, 2020, were not valid under the EMA, and held that the EPGA, as construed by the majority in Justice MARKMAN's opinion, constituted an unconstitutional delegation of legislative power. Justice VIVIANO would have concluded that the EPGA, which only allows the Governor to declare a state of emergency when public safety is imperiled, does not allow for declarations of emergency to confront public-health events like pandemics because "public health" and "public safety" are not synonymous and, in light of this conclusion resolving the issue on statutory grounds, would not have decided the constitutional question whether the EPGA violates the separation of powers. However, because the rest of the Court interpreted the statute more broadly, Justice VIVIANO addressed the constitutional issue and joined Justice MARKMAN's holding that the EPGA is an unconstitutional delegation of legislative power. Justice VIVIANO also indicated that in an appropriate future case, he would consider adopting the approach to nondelegation advocated by Justice Gorsuch in *Gundy v United States*, 588 US ___, ___; 139 S Ct 2116, 2131 (2019) (Gorsuch, J., dissenting).

Chief Justice MCCORMACK, joined by Justices BERNSTEIN and CAVANAGH, concurring in part and dissenting in part, concurred with Justice MARKMAN's opinion to the extent that it concluded that the certified questions should be answered; held that the Governor's executive orders issued after April 30, 2020, were not valid under the EMA; and rejected plaintiffs' statutory arguments that the EPGA did not authorize the Governor's executive orders. However, Chief Justice MCCORMACK dissented from the majority's constitutional ruling striking down the EPGA. The United States Supreme Court and the Michigan Supreme Court have struck down statutes under the nondelegation doctrine only when the statutes contain *no* standards to guide the decision-maker's discretion, and the delegation in the EPGA had standards—for the Governor to invoke the EPGA, her actions must be "reasonable" and "necessary," they must "protect life and property" or "bring the emergency situation . . . under control," and they may be taken only at a time of "public emergency" or "reasonable apprehension of immediate danger" when "public safety is imperiled." Those standards were as reasonably precise as the statute's subject matter permitted. Accordingly, the delegation in the EPGA did not violate the nondelegation doctrine.

Justice BERNSTEIN, concurring in part and dissenting in part, disagreed with the majority's conclusion that the EPGA is unconstitutional. An examination of caselaw from both

the Michigan Supreme Court and the United States Supreme Court supported the conclusion that, under current law, the grant of power in the EPGA does not offend the separation of powers. Justice BERNSTEIN would continue to apply the "standards" test that the Michigan Supreme Court has consistently used to analyze nondelegation challenges, would leave the decision whether to revisit the nondelegation doctrine to the United States Supreme Court, and would leave to the people of Michigan the right to mount challenges to individual orders issued under the EPGA.

©2020 State of Michigan

# OPINION

Chief Justice:
  Bridget M. McCormack

Chief Justice Pro Tem:
  David F. Viviano

Justices:
Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

FILED October 2, 2020

## STATE OF MICHIGAN

## SUPREME COURT

*In re* CERTIFIED QUESTIONS FROM
THE UNITED STATES DISTRICT
COURT, WESTERN DISTRICT OF
MICHIGAN, SOUTHERN DIVISION

MIDWEST INSTITUTE OF HEALTH,
PLLC, d/b/a GRAND HEALTH
PARTNERS, WELLSTON MEDICAL
CENTER, PLLC, PRIMARY HEALTH
SERVICES, PC, and JEFFERY GULICK,

    Plaintiffs,

v

    No. 161492
    USDC-WD: 1:20-cv-414

GOVERNOR OF MICHIGAN, MICHIGAN
ATTORNEY GENERAL, and MICHIGAN
DEPARTMENT OF HEALTH AND
HUMAN SERVICES DIRECTOR,

    Defendants.

BEFORE THE ENTIRE BENCH

MARKMAN, J.

This case concerns the nature and scope of our state's public response to one of the most threatening public-health crises of modern times. In response to a global, national, and state outbreak of the severe acute respiratory disease named COVID-19, Michigan's Governor has issued a succession of executive orders over the past six months limiting public and private gatherings, closing and imposing restrictions upon certain businesses, and regulating a broad variety of other aspects of the day-to-day lives of our state's citizens in an effort to contain the spread of this contagious and sometimes deadly disease.

The ongoing validity of these executive orders has been the subject of much public debate as well as litigation in both state and federal courts. In the interest of comity, the United States District Court for the Western District of Michigan has asked this Court to resolve critical questions concerning the constitutional and legal authority of the Governor to issue such orders. We hereby respond to the federal court in the affirmative by choosing to answer the questions the federal court has certified, concluding as follows: first, the Governor did not possess the authority under the Emergency Management Act of 1976 (the EMA), MCL 30.401 *et seq.*, to declare a "state of emergency" or "state of disaster" based on the COVID-19 pandemic after April 30, 2020; and second, the Governor does not possess the authority to exercise emergency powers under the Emergency Powers of the Governor Act of 1945 (the EPGA), MCL 10.31 *et seq.*, because that act is an unlawful delegation of legislative power to the executive branch in violation of the Michigan

2

Constitution. Accordingly, the executive orders issued by the Governor in response to the COVID-19 pandemic now lack any basis under Michigan law.[1]

## I. FACTS & HISTORY

The coronavirus (COVID-19) is a respiratory disease that can result, and has resulted, in significant numbers of persons suffering serious illness or death. In response to COVID-19, on March 10, 2020, one day before it was declared a pandemic by the World Health Organization, the Governor issued Executive Order (EO) No. 2020-04, declaring a "state of emergency" under the EPGA and the EMA. On March 20, 2020, the Governor issued EO 2020-17, which prohibited medical providers from performing nonessential procedures. On March 23, 2020, she issued EO 2020-21, which ordered all residents to stay at home with limited exceptions. On April 1, 2020, she issued EO 2020-33, which declared a "state of emergency" under the EPGA and a "state of emergency" and "state of disaster" under the EMA. She then requested that the Legislature extend the state of emergency and state of disaster by 70 days, and a resolution was adopted, extending the state of emergency and state of disaster, but only through April 30, 2020. Senate Concurrent Resolution No. 2020-24.

---

[1] Our decision leaves open many avenues for the Governor and Legislature to work together to address this challenge and we hope that this will take place. See *Gundy v United States*, 588 US ___, ___; 139 S Ct 2116, 2145; 204 L Ed 2d 522 (2019) (Gorsuch, J., dissenting) ("Respecting the separation of powers forecloses no substantive outcomes. It only requires us to respect along the way one of the most vital of the procedural protections of individual liberty found in our Constitution.").

On April 30, 2020, the Governor issued EO 2020-66, which terminated the declaration of a state of emergency and state of disaster under the EMA. But, immediately thereafter, she issued EO 2020-67, which provided that a state of emergency remained declared under the EPGA. At the same time, she issued EO 2020-68, which redeclared a state of emergency and state of disaster under the EMA.[2] Although the Governor subsequently lifted the ban on nonessential medical procedures, she then issued EO 2020-97, which imposed numerous obligations on healthcare providers, including specific waiting-room procedures, limitations on the number of patient appointments, adding special hours for highly vulnerable patients, and establishing enhanced telehealth and telemedicine procedures.[3]

Plaintiffs in the underlying federal case are healthcare providers that were prohibited from performing nonessential procedures while EO 2020-17 was in effect and a patient who was prohibited from undergoing knee-replacement surgery. Defendants are the Governor, the Attorney General, and the Director of the Michigan Department of Health and Human Services. Although EO 2020-17 has been rescinded, the federal district court held that the case is not moot because at that time EO 2020-114 (now EO 2020-184) continued to impose restrictions on healthcare providers. After the federal district court decided to certify the questions to this Court, defendants moved for reconsideration,

[2] EOs 2020-67 and 2020-68 were later rescinded by orders that themselves were subsequently rescinded. Most recently, the Governor extended the state of emergency and state of disaster in EO 2020-186, relying on both the EPGA and the EMA.

[3] EO 2020-97 was later rescinded by an order that itself was subsequently rescinded. Most recently, the Governor issued EO 2020-184 which continues to impose a variety of restrictions on healthcare providers.

4

raising-- for the first time-- Eleventh Amendment immunity. The federal district court denied this motion and held that defendants had waived such immunity by not timely raising it in either the principal briefs of their motions to dismiss or in their initial responses to the court's invitation to brief the propriety of certification to this Court. Defendants appealed that ruling, and the matter remains pending in the United States Court of Appeals for the Sixth Circuit.

The federal district court has asked this Court to address two certified questions: (1) whether, under the EMA or the EPGA, the Governor has had the authority after April 30, 2020, to issue or renew any executive orders related to the COVID-19 pandemic; and (2) whether the EPGA and/or the EMA violate the Separation of Powers and/or the Nondelegation Clauses of the Michigan Constitution. We heard oral argument on these questions on September 9, 2020.

## II. STANDARD OF REVIEW

"Matters of constitutional and statutory interpretation are reviewed de novo." *People v Skinner*, 502 Mich 89, 99; 917 NW2d 292 (2018). " '[S]tatutes are presumed to be constitutional, and we have a duty to construe a statute as constitutional unless its unconstitutionality is clearly apparent.' " *Id*. at 100, quoting *In re Sanders*, 495 Mich 394, 404; 852 NW2d 524 (2014), in turn citing *Taylor v Gate Pharm*, 468 Mich 1, 6; 658 NW2d 127 (2003).

5

## III. ANALYSIS

## A. CERTIFIED QUESTIONS

MCR 7.308(A)(2)(a) provides:

> When a federal court, another state's appellate court, or a tribal court considers a question that Michigan law may resolve and that is not controlled by Michigan Supreme Court precedent, the court may on its own initiative or that of an interested party certify the question to the Court.

MCR 7.308(A)(5) provides:

> The Supreme Court may deny the request for a certified question by order, issue a peremptory order, or render a decision in the ordinary form of an opinion to be published with other opinions of the Court. The clerk shall send a paper copy or provide electronic notice of the Court's decision to the certifying court.

Defendants argue that we should not answer the certified questions, both because the case is moot[4] and because defendants are entitled to Eleventh Amendment immunity.[5] The

---

[4] Defendants argue that the case is moot because plaintiffs originally challenged the prohibition against nonessential medical procedures established by EO 2020-17 and EO 2020-17 as well as the challenged prohibition itself have since been lifted.

[5] The Eleventh Amendment provides, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." "The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court." *Bd of Trustees of Univ of Alabama v Garrett*, 531 US 356, 363; 121 S Ct 955; 148 L Ed 2d 866 (2001). Suits brought against state officials in their official capacities are equivalent to suits against the state itself. *Kentucky v Graham*, 473 US 159, 166; 105 S Ct 3099; 87 L Ed 2d 114 (1985). However, a state may waive its Eleventh Amendment immunity through its conduct in federal court. *Lapides v Bd of Regents of the Univ Sys of Georgia*, 535 US 613, 618; 122 S Ct 1640; 152 L Ed 2d 806 (2002). The doctrine of waiver prevents states from selectively invoking immunity "to achieve unfair tactical advantages." *Id*. at 621. Here, in response to plaintiffs' motion for a preliminary injunction, defendants filed 107 pages of briefing with no mention of Eleventh Amendment immunity. Subsequently, defendants filed lengthy

federal district court held that the case is not moot because although nonessential medical procedures are no longer prohibited, plaintiffs remain subject to many restrictions, including in particular those pertaining to the number of appointments they can schedule on a daily basis. The federal district court also held that defendants had waived Eleventh Amendment immunity by waiting to raise this issue until their motion for reconsideration.

We agree with plaintiffs that this Court should not address-- much less second-guess-- the federal district court's decision to certify certain questions to this Court and not to certify others. Both mootness and Eleventh Amendment immunity are matters that fall within the jurisdiction of the federal courts, and neither matter is included within the federal court's certified questions. And those matters this Court is best equipped to answer are precisely those the federal court has certified. Therefore, those are the questions we will answer herein.

## B. THE EMA

The first question before this Court is whether the Governor possessed the authority under the EMA to renew her declaration of a state of emergency and state of disaster based

---

motions to dismiss with only passing reference to the Eleventh Amendment to assert that plaintiffs are not entitled to monetary damages. Finally, defendants filed briefs-- and oral arguments were held-- regarding the certification of the issues to this Court, and never once was Eleventh Amendment immunity raised. Defendants did not raise this matter until they filed their motion for reconsideration after the federal district court indicated that it was going to certify the questions to this Court.

on the COVID-19 pandemic after April 30, 2020.[6]  MCL 30.403 of the EMA provides, in

pertinent part:

> (3) The governor shall, by executive order or proclamation, declare a
> state of disaster if he or she finds a disaster has occurred or the threat of a
> disaster exists.  The state of disaster shall continue until the governor finds
> that the threat or danger has passed, the disaster has been dealt with to the
> extent that disaster conditions no longer exist, or until the declared state of
> disaster has been in effect for 28 days. *After 28 days, the governor shall issue*
> *an executive order or proclamation declaring the state of disaster*
> *terminated, unless a request by the governor for an extension of the state of*
> *disaster for a specific number of days is approved by resolution of both*
> *houses of the legislature. . . .*

> (4) The governor shall, by executive order or proclamation, declare a
> state of emergency if he or she finds that an emergency has occurred or that
> the threat of an emergency exists.  The state of emergency shall continue
> until the governor finds that the threat or danger has passed, the emergency
> has been dealt with to the extent that emergency conditions no longer exist,
> or until the declared state of emergency has been in effect for 28 days. *After*
> *28 days, the governor shall issue an executive order or proclamation*
> *declaring the state of emergency terminated, unless a request by the*
> *governor for an extension of the state of emergency for a specific number of*

---

[6] The parties do not dispute that the Governor possessed the authority under the EMA to issue executive orders concerning the COVID-19 pandemic prior to April 30, 2020. Moreover, as a general proposition, it cannot be denied that executive orders may be given the force of law if authorized by a statute that constitutionally delegates power to the executive or, indeed, as a function of any other constitutional authority, including that inherent within the executive power. *Cunningham v Neagle*, 135 US 1; 10 S Ct 658; 34 L Ed 55 (1890).  However, not only has no such "other" or "inherent" constitutional authority been argued, but it cannot readily be imagined that such a basis of authority would exist in support of a broad and general exercise of legislative authority by the executive branch. We specifically reject the argument offered by amicus Restore Freedom that the Governor's authority to issue executive orders is restricted to the circumstances contemplated by Const 1963, art 5, § 2, which provides that the Governor "may make changes in the organization of the executive branch or in the assignment of functions among its units which he considers necessary for efficient administration."

> *days is approved by resolution of both houses of the legislature.* [Emphasis added.]

Critically, MCL 30.403(3) and (4) provide that "[a]fter 28 days, the governor shall issue an executive order or proclamation declaring the state of [disaster/emergency] terminated, unless a request by the governor for an extension of the state of [disaster/emergency] for a specific number of days is approved by resolution of both houses of the legislature." Because the Legislature here did not approve an extension of the "state of emergency" or "state of disaster" beyond April 30, 2020, the Governor was required to issue an executive order declaring these to be terminated. While the Governor did so, she acted immediately thereafter to issue another executive order, again declaring a "state of emergency" and "state of disaster" under the EMA for the identical reasons as the declarations that had just been terminated-- the public-health crisis created by COVID-19. Given that MCL 30.403(3) and (4) required the Governor to terminate a declaration of a state of emergency or state of disaster after 28 days in the absence of a legislatively authorized extension, we do not believe that the Legislature intended to allow the Governor to redeclare under the EMA the identical state of emergency and state of disaster under these circumstances. To allow such a redeclaration would effectively render the 28-day limitation a nullity.

The Governor argues that because MCL 30.403(3) and (4) provide that "[t]he governor shall, by executive order or proclamation, declare a state of [disaster/emergency] if he or she finds [a disaster/an emergency] has occurred or the threat of [a disaster/an emergency] exists," the Governor had no choice here but to redeclare a state of emergency and state of disaster. However, when the cited language is read in reasonable conjunction with the language imposing the 28-day limitation, it is clear that the Governor only

9

possesses the authority or obligation to declare a state of emergency or state of disaster

once and then must terminate that declaration after 28 days if the Legislature has not

authorized an extension. The Governor possesses no authority-- much less obligation-- to

*redeclare* the same state of emergency or state of disaster and thereby avoid the

Legislature's limitation on her authority under the EMA. As the Court of Claims correctly

stated in *Mich House of Representatives v Governor*,[7] unpublished opinion of the Court of

Claims, issued May 21, 2020 (Docket No. 20-000079-MZ); slip op at 23-24:

> [A]t the end of the 28 days, the EMA contemplates only two outcomes: (1)
> the state of emergency and/or disaster is terminated by order of the Governor;
> or (2) the state of emergency/disaster continues *with legislative approval*.
> The only qualifier on the "shall terminate" language is an affirmative grant

---

[7] In that case, the Michigan House of Representatives and Senate filed their own cause of action against the Governor, arguing that she lacked the authority under the EMA or the EPGA to renew her declaration of a state of emergency or state of disaster based on the COVID-19 pandemic after April 30, 2020, and that, if those statutes did grant her such authority, they are unconstitutional. The Court of Claims held that the Governor lacked the authority under the EMA to renew a declaration of a state of emergency or state of disaster after April 30, 2020, based on the COVID-19 pandemic. However, the Court of Claims held that she did possess the authority under the EPGA to renew her declaration of a state of emergency after April 30, 2020, based on the COVID-19 pandemic and that the EPGA is constitutionally valid. The Court of Appeals subsequently held in a divided opinion that "the Governor's declaration of a state of emergency, her extension of the state of emergency, and her issuance of related executive orders fell within the scope of the Governor's authority under the EPGA" and that "the EPGA is constitutionally sound." *House of Representatives v Governor*, ___ Mich App ___; ___ NW2d ___ (2020) (Docket No. 353655); slip op at 1. The Court of Appeals "decline[d] to address whether the Governor was additionally authorized to take those same measures under the EMA . . . ." *Id*. at 1-2. Judge TUKEL, in dissent, concluded that with regard to the EPGA, "at least in a case such as this involving an 'epidemic,' . . . the EMA's 28-day time limit controls"; "the Governor's actions violate the EMA"; and "the Governor's actions violate the separation of powers . . . ." *Id*. at 3-4 (TUKEL, J., concurring in part and dissenting in part). The Legislature's application for leave to appeal remains pending in this Court.

of an extension from the Legislature. There is no third option for the Governor to continue the state of emergency and/or disaster on her own, absent legislative approval. . . . To adopt the Governor's interpretation of the statute would render nugatory the express 28-day limit and it would require the Court to ignore the plain statutory language.

Furthermore, and contrary to the Governor's argument, the 28-day limitation in the EMA does not amount to an impermissible "legislative veto."[8] Once again, MCL 30.403(3) and (4) provide that "[a]fter 28 days, the governor shall issue an executive order or proclamation declaring the state of [emergency/disaster] terminated, unless a request by the governor for an extension of the state of [emergency/disaster] for a specific number of days is approved by resolution of both houses of the legislature." These provisions impose nothing more than a durational limitation on the Governor's authority. The Governor's declaration of a state of emergency or state of disaster may only endure for 28 days absent legislative approval of an extension. So, if the Legislature does nothing, as it did here, the Governor is obligated to terminate the state of emergency or state of disaster after 28 days. A durational limitation is not the equivalent of a veto.

---

[8] In *Immigration & Naturalization Serv v Chadha*, 462 US 919; 103 S Ct 2764; 77 L Ed 2d 317 (1983), the United States Supreme Court concluded that a provision of the Immigration and Nationality Act that authorized "one House of Congress, by resolution, to invalidate the decision of the Executive Branch, pursuant to authority delegated by Congress to the Attorney General of the United States, to allow a particular deportable alien to remain in the United States" was unconstitutional. *Id*. at 923, citing 8 USC 1254(c)(2). And in *Blank v Dep't of Corrections*, 462 Mich 103, 113; 611 NW2d 530 (2000) (opinion by KELLY, J.), a plurality of this Court applied the reasoning of *Chadha* to conclude that statutes purporting to "retain [in the Legislature] the right to approve or disapprove rules proposed by executive branch agencies" were unconstitutional. The statutes at issue in *Chadha* and *Blank* were described as imposing "legislative vetoes."

11

As the Court of Claims again correctly explained in *Mich House of Representatives v Governor*, unpublished opinion of the Court of Claims, issued May 21, 2020 (Docket No. 20-000079-MZ); slip op at 25, "The Legislature has not 'vetoed' or negated any action by the executive branch by imposing a temporal limit on the Governor's authority; instead, it limited the amount of time the Governor can act independently of the Legislature in response to a particular emergent matter." Indeed, *Immigration & Naturalization Serv v Chadha*, 462 US 919, 955 n 19; 103 S Ct 2764; 77 L Ed 2d 317 (1983), itself expressly recognized that "durational limits on authorizations . . . lie well within Congress' constitutional power." That is exactly what the 28-day limitation establishes-- a durational limitation on an authorization. Nothing prohibits the Legislature from placing such a limitation on authority delegated to the Governor, and such a limitation does not render illusory in any way the delegation itself.

For these reasons, we conclude that the Governor did not possess the authority under the EMA to renew her declaration of a state of emergency or state of disaster based on the COVID-19 pandemic after April 30, 2020.[9]

## C. THE EPGA

The second question before this Court is whether the Governor possessed the authority under the EPGA to proclaim a state of emergency based on the COVID-19 pandemic after April 30, 2020.

---

[9] Given that we conclude that the Governor did not possess the authority under the EMA to renew her declaration of a state of emergency or state of disaster based on the COVID-19 pandemic after April 30, 2020, it is unnecessary for us to decide whether the EMA violates the Michigan Constitution, a question also certified to this Court.

# 1. STATUTORY INTERPRETATION

MCL 10.31(1) of the EPGA sets forth the circumstances in which the Governor may proclaim a state of emergency and the authorized subject matter of his or her emergency powers:

> During times of great public crisis, disaster, rioting, catastrophe, or similar public emergency within the state, or reasonable apprehension of immediate danger of a public emergency of that kind, when public safety is imperiled, either upon application of the mayor of a city, sheriff of a county, or the commissioner of the Michigan state police or upon his or her own volition, the governor may proclaim a state of emergency and designate the area involved. After making the proclamation or declaration, the governor may promulgate reasonable orders, rules, and regulations as he or she considers necessary to protect life and property or to bring the emergency situation within the affected area under control. Those orders, rules, and regulations may include, but are not limited to, providing for the control of traffic, including public and private transportation, within the area or any section of the area; designation of specific zones within the area in which occupancy and use of buildings and ingress and egress of persons and vehicles may be prohibited or regulated; control of places of amusement and assembly and of persons on public streets and thoroughfares; establishment of a curfew; control of the sale, transportation, and use of alcoholic beverages and liquors; and control of the storage, use, and transportation of explosives or inflammable materials or liquids deemed to be dangerous to public safety.

MCL 10.31(2) of the EPGA sets forth the effectiveness of the emergency powers, including the time at which those powers are no longer in effect:

> The orders, rules, and regulations promulgated under subsection (1) are effective from the date and in the manner prescribed in the orders, rules, and regulations and shall be made public as provided in the orders, rules, and regulations. The orders, rules, and regulations may be amended, modified, or rescinded, in the manner in which they were promulgated, from time to time by the governor during the pendency of the emergency, but shall cease to be in effect upon declaration by the governor that the emergency no longer exists.

MCL 10.32 explains the legislative intentions of the EPGA:

> It is hereby declared to be the legislative intent to invest the governor with sufficiently broad power of action in the exercise of the police power of the state to provide adequate control over persons and conditions during such periods of impending or actual public crisis or disaster. The provisions of this act shall be broadly construed to effectuate this purpose.[10]

Plaintiffs argue that a genuine emergency must necessarily be short-lived and that because our state has been dealing with COVID-19 for more than six months, it is no longer an emergency. We respectfully disagree. "Emergency" is defined as "an urgent need for assistance or relief." *Merriam-Webster's Collegiate Dictionary* (11th ed). Simply because something has been ongoing for some extended period of time does not signify that there is no longer an "urgent need for assistance or relief." That a fire, for example, has been burning for months does not mean that there is no longer an "urgent need for assistance or relief," and the same is obviously true of an epidemic. In short, an emergency is an emergency for as long as it persists as an emergency.

Furthermore, the Legislature argues that the EPGA only encompasses local-- not statewide-- emergencies. It relies on the fact that the EPGA refers to a public emergency "within the state," MCL 10.31(1), and contends that a statewide emergency is not "within" the state. Again, we disagree and believe that such a reading does not constitute a reasonable understanding of the language of the statute. "Within" simply means "the inside

---

[10] The EPGA includes two other provisions, neither of which is relevant here. MCL 10.31(3) provides that "Subsection (1) does not authorize the seizure, taking, or confiscation of lawfully possessed firearms, ammunition, or other weapons," and MCL 10.33 provides that "[t]he violation of any such orders, rules and regulations made in conformity with this act shall be punishable as a misdemeanor, where such order, rule or regulation states that the violation thereof shall constitute a misdemeanor."

of." *Merriam-Webster's Collegiate Dictionary* (11th ed). A statewide emergency is an emergency "within the inside of the state," with the entirety of Michigan's counties, cities, and townships fairly described as being located "within the inside of the state."

The Legislature also argues that the EPGA's references to the "area involved," the "affected area," "any section of the area," and "specific zones within the area" signify that the EPGA was only intended to apply to local emergencies. Again, we disagree and do not find this to be a reasonable understanding of the EPGA. "Area" is defined as "a geographic region." *Merriam-Webster's Collegiate Dictionary* (11th ed). The "area involved" or the "affected area" may comprise the entire state, or it may comprise some more localized geographical part of the state. Indeed, the EMA, which all agree is applicable to statewide emergencies such as the present pandemic, also refers repeatedly to the "threatened area." See MCL 30.403(3) and (4); MCL 30.405(1)(e) and (g). And that the Governor may promulgate rules that pertain to the "affected area," to a "section" of the affected area, or to a "specific zone" within the affected area does not indicate that the Governor cannot declare a statewide emergency. It simply means that once the Governor has declared a statewide emergency, she is not obligated to treat the entire state in an identical manner.[11]

Additionally, both plaintiffs and the Legislature argue that the historical context of the EPGA, enacted in 1945 in response to riots in Detroit in 1943, suggests that it was

---

[11] Plaintiffs also argue that because the EPGA empowers certain *local* officials to seek an emergency declaration, the concerns of the statute are primarily local in nature. However, the EPGA also empowers the commissioner of the Michigan state police to request such a declaration, and of course, it allows the Governor herself to proclaim a state of emergency upon her own volition.

15

intended to apply only to local emergencies. However, even if an undisputed or a principal purpose of the EPGA was to enable the Governor to respond to a local emergency such as a riot, that does not indicate that enabling the Governor to respond to a local emergency was the EPGA's *exclusive* purpose. "[T]he remedy [of a legal provision] often extends beyond the particular act or mischief which first suggested the necessity of the law." *Dist of Columbia v Heller*, 554 US 570, 578; 128 S Ct 2783; 171 L Ed 2d 637 (2008) (quotation marks and citations omitted). That is, historical context and rationale, while often helpful in giving reasonable meaning to a statute, cannot ultimately take priority over its actual language. What is dispositive here is that the actual terms of the EPGA do not preclude the Governor from proclaiming a state of emergency in response to a statewide emergency.

In *House of Representatives v Governor*, ___ Mich App___; ___ NW2d ___ (2020) (Docket No. 353655) (TUKEL, J., concurring in part and dissenting in part); slip op at 3, Judge TUKEL concluded in a thoughtful dissent that "at least in a case such as this involving an 'epidemic,' . . . the EMA's 28-day time limit controls." He relied on the fact that the definition of "disaster" within the EMA includes an "epidemic" while the EPGA does not include that term. However, the definition of "disaster" within the EMA includes a variety of examples of types of disasters, and if all of those types of disasters were excluded from the EPGA using Judge TUKEL's reasoning, the EPGA would be effectively rendered a nullity,[12] running afoul of the interpretive maxim that "a court should avoid a construction

---

[12] The EMA defines "disaster" as "an occurrence or threat of widespread or severe damage, injury, or loss of life or property resulting from a natural or human-made cause, including, but not limited to, fire, flood, snowstorm, ice storm, tornado, windstorm, wave action, oil spill, water contamination, utility failure, hazardous peacetime radiological incident, major

16

that would render any part of the statute surplusage or nugatory." *In re MCI Telecom Complaint*, 460 Mich 396, 414; 596 NW2d 164 (1999). Such an understanding of the EPGA would also run afoul of the EMA, which provides, in pertinent part:

> This act shall not be construed to do any of the following:
>
> * * *
>
> (d) Limit, modify, or abridge the authority of the governor to proclaim a state of emergency pursuant to [the EPGA] or exercise any other powers vested in him or her under the state constitution of 1963, statutes, or common law of this state independent of, or in conjunction with, this act. [MCL 30.417.]

To rely on the inclusion of the word "epidemic" within the EMA to conclude that the EPGA does not apply, or that the 28-day limitation of the EMA does apply to the EPGA, would, in our judgment, be to construe the EMA to "[l]imit, modify, or abridge the authority of the governor" under the EPGA, which is prohibited by MCL 30.417.[13]

Finally, Justice VIVIANO concludes after a thorough and considered analysis that the EPGA does not apply "in the sphere of public health generally or to an epidemic like

---

transportation accident, hazardous materials incident, epidemic, air contamination, blight, drought, infestation, explosion, or hostile military action or paramilitary action, or similar occurrences resulting from terrorist activities, riots, or civil disorders." MCL 30.402(e). If the EPGA does not apply to emergencies arising from one of the above circumstances, we are uncertain as to what type of emergencies the EPGA would apply. Judge TUKEL opined that the Legislature could not have intended for both the EPGA and the EMA to apply to epidemics. However, both the EPGA and the EMA explicitly state that they apply to riots. Accordingly, the Legislature obviously intended for there to be some level of overlap between the two acts.

[13] Similarly, reading the 28-day time limitation of the EMA into the EPGA on the basis that these two statutes stand *in pari materia*, as argued by plaintiffs, is also, in our judgment, precluded by MCL 30.417.

17

COVID-19 in particular" because the EPGA only allows the Governor to declare a state of emergency "when public safety is imperiled," MCL 10.31(1), and "public safety" does not encompass "public health." Although we agree with Justice VIVIANO that the EPGA only allows the Governor to declare a state of emergency "when public safety is imperiled," we respectfully disagree that public-health emergencies such as the COVID-19 pandemic cannot be said to imperil "public safety." "Public" is defined as "relating to people in general," *Merriam-Webster's Collegiate Dictionary* (11th ed), and "safety" is defined as "the condition of being safe from undergoing or causing hurt, injury, or loss," *id*. Given that COVID-19 has resulted in the deaths of many thousands in Michigan and hundreds of thousands across the country,[14] COVID-19, in our judgment, can reasonably be said to imperil "public safety."

The people of this state, as well as their public officials, deserve to be able to read and to comprehend their own laws. See, e.g., *Garg v Macomb Co Community Mental Health Servs*, 472 Mich 263, 284 n 10; 696 NW2d 646 (2005) ("[L]aws are also made more accessible to the people when each of them is able to read the law and thereby understand his or her rights and responsibilities. When the words of the law bear little or no relationship to what courts say the law means . . . , then the law increasingly becomes the exclusive province of lawyers and judges."); *Robinson v Detroit*, 462 Mich 439, 467; 613

---

[14] See Centers for Disease Control and Prevention, *Provisional Death Counts for Coronavirus Disease 2019 (COVID-19)* <https://www.cdc.gov/nchs/nvss/vsrr/covid19/index.htm> (accessed October 1, 2020) [https://perma.cc/6UPD-RHZ3].

NW2d 307 (2000) ("[I]f the words of the statute are clear, the actor should be able to expect, that is, rely, that they will be carried out by all in society, including the courts."). As Justice COOLEY once explained:

> [Courts] may give a sensible and reasonable interpretation to legislative expressions which are obscure, but they have no right to distort those which are clear and intelligible. The fair and natural import of the terms employed, in view of the subject matter of the law, is what should govern[.] [*People ex rel Twitchell v Blodgett*, 13 Mich 127, 167-168 (1865).]

See also MCL 8.3a ("All words and phrases shall be construed and understood according to the common and approved usage of the language; but technical words and phrases, and such as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning."). We disagree with Justice VIVIANO that "public safety" constitutes a legal term of art. There is nothing "obscure," "peculiar," or "technical" about the phrase "public safety." Rather, this phrase is reasonably "clear," "intelligible," and "common"-- so much so that prior to Justice VIVIANO first asserting his analysis at oral argument, nobody had argued on their own accord in either this case or in *House of Representatives v Governor* that COVID-19 did not imperil "public safety."[15] Moreover, it is telling that not one of the sources cited by Justice VIVIANO asserts, as does he, that a public-health emergency such as COVID-19 does not, reasonably understood, imperil "public safety." Indeed, both the United States

---

[15] Indeed, before Justice VIVIANO presented his analysis at oral argument, plaintiffs themselves effectively conceded that COVID-19 imperiled "public safety." See Plaintiffs' Reply Brief (August 20, 2020) at 1 ("Plaintiffs acknowledge that for 51 days following the Governor's first declaration of a state of emergency based on COVID-19, the Governor acted within the bounds of the enabling statutes and the Michigan Constitution."); *id*. at 3 ("The Governor acted within the limits of her authority for 51 days.").

19

Supreme Court and this Court have long recognized to the contrary. See, e.g., *Jacobson v Massachusetts*, 197 US 11, 37; 25 S Ct 358; 49 L Ed 643 (1905) ("It seems to the court that an affirmative answer to these questions [in *Jacobson*] would practically strip the legislative department of its function to care for the public health and the *public safety* when endangered by *epidemics* of disease.") (emphasis added); *People ex rel Hill v Lansing Bd of Ed*, 224 Mich 388, 391; 195 NW 95 (1923) ("[A] community has the right to protect itself against an *epidemic* of disease which threatens the *safety* of its members.") (quotation marks and citation omitted; emphasis added).

Once again, "[t]his Court 'must presume a statute is constitutional and construe it as such, unless the only proper construction renders the statute unconstitutional.' " *Grebner v State*, 480 Mich 939, 940 (2007) (citation omitted). Accordingly, "assuming that there are two *reasonable* ways of interpreting [a statute]-- one that renders the statute unconstitutional and one that renders it constitutional-- we should choose the interpretation that renders the statute constitutional." *Skinner*, 502 Mich at 110-111 (emphasis added). However, we are not prepared to rewrite the EPGA or to construe it in an overly narrow or strained manner to avoid rendering it unconstitutional under the nondelegation doctrine or any other constitutional doctrine.[16] To do so would read the EPGA in a way that does not

---

[16] In addressing the constitutionality of a statute, this Court itself must be regardful of the separation of powers. We are not empowered to add, subtract, or modify a statute out of judicial preference. Rather, it is the province of the Legislature to make the law through the process of bicameral passage and presentment to the executive, and it is our duty only to state, to the best of our judgment, what that law requires. By the same token, it is also the responsibility of this Court in recognizing the separation of powers to ensure that the Legislature does not exceed its constitutional authority in "making the law" either by

20

reflect the genuine intentions of the statute's framers, an approach that would be in ironic conflict with the fundamental premise of the nondelegation doctrine itself, which is that the laws of our state are to be determined by the Legislature. For these reasons, we conclude that there is one predominant and reasonable construction of the EPGA-- the construction given to it by the Governor. This is not to say, however, that the construction advanced by the Governor and the other defendants renders the EPGA a constitutionally permissible delegation of legislative power to the executive. To the contrary, while the EPGA purports to grant the Governor the power to proclaim a state of emergency based on the COVID-19 pandemic, and accordingly to exercise broad emergency powers, the EPGA by that very construction stands in violation of the Michigan Constitution.

## 2. NONDELEGATION DOCTRINE

Const 1963, art 3, § 2 summarizes the separation-of-powers principle in Michigan as follows:

> The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution.

"[T]he principal function of the separation of powers . . . is to . . . protect individual liberty[.]" *Clinton v City of New York*, 524 US 417, 482; 118 S Ct 2091; 141 L Ed 2d 393 (1998) (Breyer, J., dissenting). " '[T]he accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary,

---

encroaching upon the powers of another branch or by relinquishing its own powers to another branch.

21

self-appointed, or elective, may justly be pronounced the very definition of tyranny.' " *46th Circuit Trial Court v Crawford Co*, 476 Mich 131, 141; 719 NW2d 553 (2006), quoting The Federalist No. 47 (Madison) (Rossiter ed, 1961), p 301.  And as Montesquieu explained, "[w]hen the legislative and executive powers are united in the same person, or in the same body of magistrates, there can be no liberty; because apprehensions may arise, lest the same monarch or senate should enact tyrannical laws, to execute them in a tyrannical manner."  Baron de Montesquieu, *The Spirit of the Laws* (London: J. Nourse and P. Vaillant, 1758), Book XI, ch 6, p 216.

Const 1963, art 4, § 1 provides that "the legislative power of the State of Michigan is vested in a senate and a house of representatives."  "The 'legislative power' has been defined as the power 'to regulate public concerns, and to make law for the benefit and welfare of the state.' "  *46th Circuit Trial Court*, 476 Mich at 141, quoting Cooley, Constitutional Limitations (1886), p 92.  "The power of the *Legislative* being derived from the People by a positive voluntary Grant and Institution, can be no other, than what that positive Grant conveyed, which being only to make *Laws*, and not to make *Legislators*, the *Legislative* can have no power to transfer their Authority of making Laws, and place it in other hands."  Locke, *Two Treatises of Government* (New York: New American Library, Laslett ed, 1963), pp 408-409.  Accordingly, "[o]ne of the settled maxims in constitutional law is, that the power conferred upon the legislature to make laws cannot be delegated by that department to any other body or authority."  Cooley, Constitutional Limitations (1886), pp 116-117.

"Strictly speaking, there is *no* acceptable delegation of legislative power." *Mistretta v United States*, 488 US 361, 419; 109 S Ct 647; 102 L Ed 2d 714 (1989) (Scalia, J.,

dissenting). "The true distinction . . . is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made." *Marshall Field & Co v Clark*, 143 US 649, 693-694; 12 S Ct 495; 36 L Ed 294 (1892) (quotation marks and citation omitted). "[A] certain degree of discretion, and thus of lawmaking, *inheres* in most executive or judicial action . . . ." *Mistretta*, 488 US at 417 (Scalia, J., dissenting). "The focus of controversy . . . has been whether the *degree* of generality contained in the authorization for exercise of executive or judicial powers in a particular field is so unacceptably high as to *amount* to a delegation of legislative powers." *Id*. at 419.

We have explained that "[c]hallenges of unconstitutional delegation of legislative power are generally framed in terms of the adequacy of the standards fashioned by the Legislature to channel the agency's or individual's exercise of the delegated power." *Blue Cross & Blue Shield of Mich v Milliken*, 422 Mich 1, 51; 367 NW2d 1 (1985). "The preciseness required of the standards will depend on the complexity of the subject." *Id*. "In making this determination whether the statute contains sufficient limits or standards we must be mindful of the fact that such standards must be sufficiently broad to permit efficient administration in order to properly carry out the policy of the Legislature but not so broad as to leave the people unprotected from uncontrolled, arbitrary power in the hands of administrative officials." *Dep't of Natural Resources v Seaman*, 396 Mich 299, 308-309; 240 NW2d 206 (1976). "[T]he standards prescribed for guidance [must be] as reasonably precise as the subject-matter requires or permits." *Osius v St Clair Shores*, 344 Mich 693, 698; 75 NW2d 25 (1956).

23

The United States Supreme Court[17] has explained that "[s]o long as Congress 'shall lay down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform, such legislative action is not a forbidden delegation of legislative power.' " *Mistretta*, 488 US at 372, quoting *J W Hampton, Jr & Co v United States*, 276 US 394, 409; 48 S Ct 348; 72 L Ed 624 (1928) (brackets omitted).[18] That is, "[t]he constitutional question is whether Congress has supplied an intelligible principle to guide the delegee's use of discretion." *Gundy v United States*, 588 US ___, ___; 139 S Ct 2116, 2123; 204 L Ed 2d 522 (2019) (opinion by Kagan, J.). "[T]he answer requires construing the challenged statute to figure out what task it delegates and what instructions it provides." *Id.*

The scope of the delegation is also relevant when assessing the sufficiency of the standards. "[T]he degree of agency discretion that is acceptable varies according to the

---

[17] In *Taylor*, 468 Mich at 10, we observed that our nondelegation caselaw is "similar to the federally developed" nondelegation caselaw.

[18] The "intelligible principle" test has been subject to growing criticism by some members of the United States Supreme Court in recent years for failing to sufficiently protect the separation of powers. See, e.g., *Dep't of Transp v Ass'n of American Railroads*, 575 US 43, 77; 135 S Ct 1225; 191 L Ed 2d 153 (2015) (Thomas, J., concurring) ("Implicitly recognizing that the power to fashion legally binding rules is legislative, we have nevertheless classified rulemaking as executive (or judicial) power when the authorizing statute sets out 'an intelligible principle' to guide the rulemaker's discretion. . . . I would return to the original understanding of the federal legislative power and require that the Federal Government create generally applicable rules of private conduct only through the constitutionally prescribed legislative process."); *Gundy*, 588 US at ___; 139 S Ct at 2140 (Gorsuch, J., dissenting) (asserting that the "intelligible principle" test "has been abused to permit delegations of legislative power that on any other conceivable account should be held unconstitutional"). Nonetheless, the "intelligible principle" test remains as the dominant expression of what is required to sustain a constitutional delegation of powers.

scope of the power . . . conferred." *Whitman v American Trucking Associations, Inc*, 531 US 457, 475; 121 S Ct 903; 149 L Ed 2d 1 (2001). Consequently, "the ultimate judgment regarding the constitutionality of a delegation must be made not on the basis of the scope of the power alone, but on the basis of its scope *plus* the specificity of the standards governing its exercise. When the scope increases to immense proportions . . . the standards must be correspondingly more precise." *Synar v United States*, 626 F Supp 1374, 1386 (D DC, 1986). See also *Int'l Refugee Assistance Project v Trump*, 883 F3d 233, 293 (CA 4, 2018) (Gregory, C.J., concurring) ("When broad power is delegated with few or no constraints, the risk of an unconstitutional delegation is at its peak. . . . Therefore, whether a delegation is unconstitutional depends on two factors—the amount of discretion and the scope of authority."), vacated by *Trump v Int'l Refugee Assistance Project*, 585 US ___; 138 S Ct 2710 (2018). As the federal Court of Appeals for the District of Columbia Circuit has recognized in a series of cases, a critical component of the scope of the delegated "power" is the breadth of subjects to which the power can be applied:

> But petitioners have ignored a limit to the nondelegation doctrine that we relied on in *American Trucking* and even more emphatically in its immediate precursor, *International Union, UAW v. OSHA ("Lockout/Tagout I")*, 938 F.2d 1310 (D.C.Cir.1991). There we noted that the scope of the agency's "claimed power to roam" was "immense, encompassing all American enterprise." *Id.* at 1317. Quoting verbatim from *Synar v. United States*, 626 F.Supp. 1374, 1383 (D.D.C.1986) (three-judge panel), *aff'd sub nom. Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986), we said, "When the scope increases to immense proportions, as in [*Schechter Poultry Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935) ], the standards must be correspondingly more precise." *Lockout/Tagout I*, 938 F.2d at 1317. We noted that a mass of cases in courts had upheld delegations of effectively standardless discretion, and distinguished them precisely on the ground of the narrower scope within which the agencies could deploy that discretion. *Id.* [*Michigan v US*

25

*Environmental Protection Agency*, 341 US App DC 306, 323; 213 F3d 663 (2000) (brackets in original).]

In other words, it is one thing if a statute confers a great degree of discretion, i.e., power, over a narrow subject; it is quite another if that power can be brought to bear on something as "immense" as an entire economy. See *Schechter Poultry Corp v United States*, 295 US 495, 539; 55 S Ct 837; 79 L Ed 1570 (1935) (striking down a delegation to the President to approve trade standards when the "authority relates to a host of different trades and industries, thus extending the President's discretion to all the varieties of laws which he may deem to be beneficial in dealing with the vast array of commercial and industrial activities throughout the country"). Furthermore, "[t]he area of permissible indefiniteness narrows . . . when the regulation invokes criminal sanctions and potentially affects fundamental rights . . . ." *United States v Robel*, 389 US 258, 275; 88 S Ct 419; 19 L Ed 2d 508 (1967) (Brennan, J., concurring in the result).

Finally, the durational scope of the delegated power also has some relevant bearing, in our judgment, on whether the statute violates the nondelegation doctrine. Of course, an unconstitutional delegation is no less unconstitutional because it lasts for only two days. But it is also true, as common sense would suggest, that the conferral of indefinite authority accords a greater accumulation of power than does the grant of temporary authority. Courts have recognized this consideration, although they have also acknowledged that it is not often dispositive. In *Gundy*, for example, the plurality thought it relevant to the delegation analysis in that case that the statute accorded the executive "only temporary authority." *Gundy*, 588 US at ___; 139 S Ct at 2130; see also *United States v Touby*, 909 F2d 759, 767 (CA 3, 1990) ("[I]t was reasonable for Congress to broadly delegate special authority to

26

the Attorney General, particularly when the delegation permits scheduling to be effective only for a limited period of time."); *United States v Emerson*, 846 F2d 541, 545 (CA 9, 1988) (upholding delegation because, in part, the delegated power was temporary); *Amalgamated Meat Cutters & Butcher Workmen of North America, AFL-CIO v Connally*, 337 F Supp 737, 754 (D DC, 1971) ("It is also material, though not dispositive, to note the limited time frame established by Congress for the stabilization authority delegated to the President."); *Marran v Baird*, 635 A2d 1174, 1181 (RI, 1994) (upholding a delegation because, in part, the danger of "administrative abuse" was diminished given the limited duration of the delegated authority).

It is therefore impossible to ascertain whether the standards set forth in the EPGA that guide the Governor's discretionary exercise of her emergency powers satisfy the nondelegation doctrine without first assessing the precise scope of these powers. Simply put, as the scope of the powers conferred upon the Governor by the Legislature becomes increasingly broad, in regard to both the *subject matter* and their *duration*, the *standards* imposed upon the Governor's discretion by the Legislature must correspondingly become more detailed and precise.

a. SCOPE OF DELEGATED POWER

Concerning the subject matter of the emergency powers conferred by the EPGA, it is remarkably broad, authorizing the Governor to enter orders "to protect life and property or to bring the emergency situation within the affected area under control." MCL 10.31(1). It is indisputable that such orders "to protect life and property" encompass a substantial part of the entire police power of the state. See *Connor v Herrick*, 349 Mich 201, 217; 84 NW2d 427 (1957) ("[T]here seems to be no doubt that [the police power] does extend to

27

the protection of the *lives, health, and property of the citizens*, and to the preservation of good order and public morals.") (emphasis added). And the police power is legislative in nature. See *Bolden v Grand Rapids Operating Corp*, 239 Mich 318, 321; 214 NW 241 (1927) ("The power we allude to is rather the police power, the power vested in the Legislature by the Constitution, to make, ordain and establish all manner of wholesome and reasonable laws . . . .") (quotation marks and citation omitted). The EPGA "in effect, suspends normal civil government." *Walsh v River Rouge*, 385 Mich 623, 639; 189 NW2d 318 (1971). "The invocation of a curfew or restriction on the right to assemble or prohibiting the right to carry on businesses licensed by the State of Michigan involves the suspension of constitutional liberties of the people." *Id*.

To illustrate the breadth of the emergency powers contemplated by the EPGA, we note that during the COVID-19 pandemic the Governor has, by way of executive orders specifically issued under the EPGA, effected the following public policies: *requiring* all residents to stay home with limited exceptions; *requiring* all residents to wear face coverings in indoor public spaces and when outdoors if unable to consistently maintain a distance of six feet or more from individuals who are not members of their household, including requiring children to wear face coverings while playing sports; *requiring* all residents to remain at least six feet away from people outside one's household to the extent feasible under the circumstances; *requiring* businesses to comply with numerous workplace safeguards, including daily health screenings of employees; *closing* restaurants, food courts, cafes, coffeehouses, bars, taverns, brew pubs, breweries, microbreweries, distilleries, wineries, tasting rooms, clubs, hookah bars, cigar bars, vaping lounges, barbershops, hair salons, nail salons, tanning salons, tattoo parlors, schools, churches,

28

theaters, cinemas, libraries, museums, gymnasiums, fitness centers, public swimming pools, recreation centers, indoor sports facilities, indoor exercise facilities, exercise studios, spas, casinos, and racetracks; *closing* places of public amusement, including arcades, bingo halls, bowling alleys, indoor climbing facilities, skating rinks, and trampoline parks; *prohibiting* nonessential travel, in-person work that is not necessary to sustain or protect life, and nonessential in-person business operations; *prohibiting* the sale of carpet, flooring, furniture, plants, and paint; *prohibiting* advertisements for nonessential goods, nonessential medical and dental procedures, and nonessential veterinary services; *prohibiting* visitors at healthcare facilities, residential care facilities, congregate care facilities, and juvenile justice facilities; and *prohibiting* boating, golfing, and public and private gatherings of persons not part of a single household. Each of these policies was putatively ordered "to protect life and property" and/or to "bring the emergency situation within the affected area under control." What is more, these policies exhibit a sweeping scope, both with regard to the subjects covered and the power exercised over those subjects. Indeed, they rest on an assertion of power to reorder social life and to limit, if not altogether displace, the livelihoods of residents across the state and throughout wide-ranging industries.

### b. DURATION OF DELEGATED POWER

Concerning the duration of the emergency powers conferred by the EPGA, those powers may be exercised until a "declaration by the governor that the emergency no longer exists." MCL 10.31(2). Thus, the Governor's emergency powers are of indefinite duration. This, of course, is very much unlike the EMA, which provides that "[t]he state of emergency shall continue until the governor finds that the threat or danger has passed,

29

the emergency has been dealt with to the extent that emergency conditions no longer exist, or until the declared state of emergency *has been in effect for 28 days*." MCL 30.403(4) (emphasis added). And as the present circumstances illustrate, if the emergency is unresolved for a period of months or longer, the emergency powers under the EPGA may be exercised for a period of months or longer.[19] The fact that the EPGA authorizes indefinite exercise of emergency powers for perhaps months-- or even years-- considerably broadens the scope of authority conferred by that statute. See *Youngstown Sheet & Tube Co v Sawyer*, 343 US 579, 652-653; 72 S Ct 863; 96 L Ed 1153 (1952) (Jackson, J., concurring) (explaining that "Congress may and has granted extraordinary authorities which lie dormant in normal times but may be called into play by the Executive in war or upon proclamation of a national emergency" but that those "authorities" are perhaps best characterized as "temporary law"). Thus, under the EPGA, the state's legislative authority, including its police powers, may conceivably be delegated to the state's executive authority for an indefinite period.

---

[19] When Justice BERNSTEIN questioned counsel for the Governor during oral argument concerning the ending point of the Governor's exercise of emergency powers under the EPGA, counsel replied:

> Regarding this pandemic in terms of timing, while I have no crystal ball, the reasonable prognostication is that we're talking about a matter of months. So we're looking at certain benchmarks: sufficient immunity, vaccination, therapeutic interventions, and a combination of those things. [Michigan Supreme Court, *Oral Arguments in In re Certified Questions* <https://www.youtube.com/watch?v=HyBanqtCLvo> at 1:44:20 to 1:44:38 (accessed September 29, 2020).]

### c. STANDARDS OF DELEGATED POWER

It is against the above backdrop that the constitutionality of the standards, or legislative direction to the executive branch, set forth in the EPGA must be considered. What standards or legislative direction are sufficient to transform a delegation of power in which what is being delegated consists of pure legislative policymaking power into a delegation in which what is being delegated has been made an essentially executive "carrying-out of policy" power by virtue of the accompanying direction given by the Legislature to the executive in the delegation? When the scope of the power delegated "increases to immense proportions . . . the standards must be correspondingly more precise." *Synar*, 626 F Supp at 1386. Under the EPGA, the standards governing the Governor's exercise of emergency powers include only the words "reasonable" and "necessary." See MCL 10.31(1) ("After making the proclamation or declaration, the governor may promulgate *reasonable* orders, rules, and regulations as he or she considers *necessary* to protect life and property or to bring the emergency situation within the affected area under control.") (emphasis added).

Concerning the term "reasonableness," that word places a largely (if not entirely) illusory limitation upon the Governor's discretion because the Legislature is presumed not to delegate the authority to act unreasonably in the first place. In this regard, in *Mich Farm Bureau v Bureau of Workmen's Compensation*, 408 Mich 141; 289 NW2d 699 (1980), we explained that an administrative rule is valid " 'if it is (a) within the granted power, (b) issued pursuant to proper procedure, and (c) reasonable. The requirement of reasonableness stems both from the idea of constitutional due process and from the idea of statutory interpretation that legislative bodies are assumed to intend to avoid the delegation

31

of power to act unreasonably.' " *Id*. at 149, quoting 1 Davis, Administrative Law, § 5.03, p 299.  See also *American Radio Relay League, Inc v Fed Communications Comm*, 199 US App DC 293, 297; 617 F2d 875 (1980) ("We fail to find significance in the fact that Congress said 'reasonable regulations' instead of simply 'regulations.' . . . Here, the word 'reasonable' clearly is nothing more than surplusage, for we cannot assume that Congress would ever intend anything other than reasonable agency action.").  Although those cases addressed delegated agency powers, we see no reason why the same principle would not apply to all powers delegated to the executive.  Accordingly, the reference in MCL 10.31(1) to "reasonable orders, rules, and regulations" communicates little more than simply "orders, rules, and regulations."  The word "reasonable"-- far from imposing a significant or in any way meaningful standard upon the Governor-- is essentially surplusage.  It neither affords direction to the Governor for how to carry out the powers that have been delegated to her nor constrains her conduct in any realistic manner.

Concerning the term "necessary," that word means "absolutely needed : REQUIRED."  *Merriam-Webster's Collegiate Dictionary* (11th ed).  Given the exceptionally broad scope of the EPGA, which authorizes indefinite orders that are "necessary to protect life and property," we believe that such a standard is also insufficient to satisfy the nondelegation doctrine when considered both in isolation and alongside the word "reasonable."  It is elementary that "life" and "property" may be threatened by a virtually unlimited array of conduct, circumstances, and serendipitous occurrences.  A person driving on the road instead of staying inside at home, for example, may fairly be understood as posing a threat to "life" and "property" because there is perpetual risk that he or she will be involved in an automobile accident.  Thus, the Governor under the EPGA

32

may find that an order prohibiting a person from driving is warranted merely on the basis of this rationale. The contagions, accidents, misfortunes, risks, and acts of God, ordinarily and inevitably associated with the human condition and with our everyday social experiences, are simply too various for this standard to supply any meaningful limitation upon the exercise of the delegated power. Simply put, the EPGA, in setting forth a "necessary" standard, just as in setting forth a "reasonable" standard, neither supplies genuine guidance to the Governor as to how to exercise the authority delegated to her by the EPGA nor constrains her actions in any meaningful manner.[20]

---

[20] In *Touby v United States*, 500 US 160; 111 S Ct 1752; 114 L Ed 2d 219 (1991), the United States Supreme Court upheld as constitutional 21 USC 811(h) of the Controlled Substances Act, 21 USC 801 *et seq*., which provided that "the Attorney General can schedule a substance on a temporary basis when doing so is 'necessary to avoid an imminent hazard to the public safety.'" *Id*. at 163, quoting 21 USC 811(h). The Court explained that the statute satisfied the nondelegation doctrine because the surrounding statutes imposed other standards upon the Attorney General's discretion to temporarily schedule a substance:

> Although it features fewer procedural requirements than the permanent scheduling statute, § 201(h) meaningfully constrains the Attorney General's discretion to define criminal conduct. To schedule a drug temporarily, the Attorney General must find that doing so is "necessary to avoid an imminent hazard to the public safety." § 201(h)(1), 21 U.S.C. § 811(h)(1). In making this determination, he is "required to consider" three factors: the drug's "history and current pattern of abuse"; "[t]he scope, duration, and significance of abuse"; and "[w]hat, if any, risk there is to the public health." §§ 201(c)(4)-(6), 201(h)(3), 21 U.S.C. §§ 811(c)(4)-(6), 811(h)(3). Included within these factors are three other factors on which the statute places a special emphasis: "actual abuse, diversion from legitimate channels, and clandestine importation, manufacture, or distribution." § 201(h)(3), 21 U.S.C. § 811(h)(3). The Attorney General also must publish 30-day notice of the proposed scheduling in the Federal Register, transmit notice to the Secretary of HHS, and "take into consideration any comments

In this regard, we also find illuminating an advisory opinion written in the midst of World War II by the Supreme Judicial Court of Massachusetts. *Opinion of the Justices*, 315 Mass 761; 52 NE2d 974 (1944). The statute at issue was a wartime measure allowing the governor to " 'have and . . . [to] exercise any and all authority over persons and property, necessary or expedient for meeting the supreme emergency of such a state of war,' " as consistent with the state constitution. *Id*. at 766, citing Mass Acts of 1942, ch 13, special session. The question posed was whether this statute allowed the governor to modify statutes establishing the date of state primaries so as to allow soldiers to vote. *Id*. at 765. The majority recognized that this statute would allow the governor "to render inoperative any law inconsistent with" his orders and to wield "all authority of every kind over persons or property which it could constitutionally confer upon him by specific enactments wherein the precise powers intended to be granted and the manner of their exercise should be particularly stated, subject only to the limitation that the action taken by the Governor shall be 'necessary or expedient for meeting the supreme emergency' of war." *Id*. at 767. The majority did not believe that the state constitution allowed the Legislature to confer upon the governor "a roving commission to repeal or amend by executive order unspecified provisions included anywhere in the entire body of" state law. *Id*. The standard given in the statute-- "necessary" and "expedient' for the war

submitted by the Secretary in response." §§ 201(h)(1), 201(h)(4), 21 U.S.C. §§ 811(h)(1), 811(h)(4). [*Id*. at 166 (brackets in original).]

As *Touby* illustrates, the word "necessary" may be a *part* of a sufficient standard imposed upon the executive branch, but we do not believe that it is *by itself* a sufficient standard, at least not in the context of the remarkably broad powers conferred by the EPGA.

"emergency"-- was "a limitation so elastic that it is impossible to imagine what might be done within its extent in almost every field of administration and of jurisprudence." *Id*. at 768. The statute thus surrendered legislative power to the executive by granting him "without specification or definition of means or ends all the powers which it could grant by specific enactment in all fields which may be affected by a factor so all pervasive as war." *Id*. The emergency-- the war-- did "not abrogate the Constitution." *Id*. See also *Home Bldg & Loan Ass'n v Blaisdell*, 290 US 398, 425; 54 S Ct 231; 78 L Ed 413 (1934) ("Emergency does not create power. Emergency does not increase granted power or remove or diminish the restrictions imposed upon power granted or reserved.").

The consequence of such illusory "non-standard" standards in this case is that the Governor possesses free rein to exercise a substantial part of our state and local legislative authority-- including police powers-- for an indefinite period of time. There is, in other words, nothing within either the "necessary" or "reasonable" standards that serves in any realistic way to transform an otherwise impermissible delegation of *legislative* power into a permissible delegation of *executive* power. This is particularly true in the specific context of the EPGA, a statute that delegates power of immense breadth and is devoid of all temporal limitations. These facets of the EPGA-- its expansiveness, its indefinite duration, and its inadequate standards-- are simply insufficient to sustain *this* delegation. While, in the context of a less-encompassing delegation, the standard might be sufficient to sustain the delegation, that is not the case the Court entertains today.

We accordingly conclude that the delegation of power to the Governor to "promulgate reasonable orders, rules, and regulations as he or she considers necessary to protect life and property," MCL 10.31(1), constitutes an unlawful delegation of legislative

power to the executive and is therefore unconstitutional under Const 1963, art 3, § 2, which prohibits exercise of the legislative power by the executive branch. The powers conferred by the EPGA simply cannot be rendered constitutional by the standards "reasonable" and "necessary," either separately or in tandem.[21]

## d. SEVERABILITY

Having reached this conclusion, we must then address whether the unlawful delegation is severable from the EPGA as a whole. MCL 8.5 provides as follows:

> In the construction of the statutes of this state the following rules shall be observed, unless such construction would be inconsistent with the manifest intent of the legislature, that is to say:

> If any portion of an act or the application thereof to any person or circumstances shall be found to be invalid by a court, such invalidity shall not affect the remaining portions or applications of the act which can be given

---

[21] Although we disagree with the Chief Justice concerning the legal definition that has been set forth by the United States Supreme Court of the nondelegation doctrine, we acknowledge in accord with her and Justice BERNSTEIN that it has been exceedingly rare for a delegation of power to have been actually invalidated by the United States Supreme Court on the basis of that doctrine. The United States Supreme Court has "found the requisite 'intelligible principle' lacking in only two statutes, one of which provided literally no guidance for the exercise of discretion, and the other of which conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'" *Whitman*, 531 US at 474, citing *Panama Refining Co v Ryan*, 293 US 388; 55 S Ct 241; 79 L Ed 446 (1935), and *Schechter Poultry Corp*, 295 US 495. Yet, just as the nondelegation doctrine constitutes an extraordinary doctrine, not routinely to be invoked, it is precisely our point that the delegation in the instant case is also extraordinary and justifies our constitutional objections. We are unaware of any other law of this state that has delegated such vast police power to the executive branch with such anemic "standards" imposed upon its discretion. If the Chief Justice and Justice BERNSTEIN would not invoke the nondelegation doctrine here, it is difficult to imagine when, if ever, they would invoke it. They would transform an admittedly rarely imposed doctrine, but one serving a critical purpose in upholding our system of separated powers, into an entirely obsolete and defunct doctrine.

effect without the invalid portion or application, provided such remaining portions are not determined by the court to be inoperable, and to this end acts are declared to be severable.

"This Court has long recognized that '[i]t is the law of this State that if invalid or unconstitutional language can be deleted from an ordinance and still leave it complete and operative then such remainder of the ordinance be permitted to stand.' " *In re Request for Advisory Opinion Regarding Constitutionality of 2011 PA 38*, 490 Mich 295, 345; 806 NW2d 683 (2011), quoting *Eastwood Park Amusement Co v East Detroit Mayor*, 325 Mich 60, 72; 38 NW2d 77 (1949).

We are convinced that severing the unlawful delegation from the remainder of the EPGA would be "inconsistent with the manifest intent of the legislature." See MCL 8.5. Our task in discerning the manifest intent of the Legislature in this regard is rather straightforward. MCL 10.32 of the EPGA provides that "[i]t is hereby declared to be the legislative intent to invest the governor with sufficiently broad power of action in the exercise of the police power of the state to provide adequate control over persons and conditions during such periods of impending or actual public crisis or disaster." Without conferring the power "to protect life and property," the EPGA *only* confers the power "to bring the emergency situation within the affected area under control." MCL 10.31(1). That is, if the unlawful delegation is severed, the EPGA confers *no* power to "control . . . persons and conditions" unless that power is exercised to "bring the emergency situation within the affected area under control." *Id*. In our judgment, the EPGA is inoperative when we sever the power to "protect life and property" from the remainder of the EPGA; therefore, the EPGA is unconstitutional in its entirety.

## IV. RESPONSE TO THE CHIEF JUSTICE

First, in her concurring and dissenting opinion, our Chief Justice is correct (or, at least, I hope she is) that "[e]very eighth-grade civics student learns about the separation of powers and checks and balances—design features of our government to prevent one branch from accumulating too much power." At the same time (again, I hope), every student also learns in that same classroom that these "design features" both define the distinctive authorities of the three branches of our government and empower each of these branches to "check and balance" the authorities of the others. And specifically relevant to the instant case is the authority of the judicial branch, in which the judiciary must identify whether the Constitution has been breached and undo such breaches, in order that the rights of the people may be upheld or that facets of our constitutional structure, including its separated powers and checks and balances that preserve and protect these same rights, may be upheld. These students will also learn that these "design features" have operated throughout our nation's history to maintain a stable, limited, and representative form of government. The nondelegation doctrine-- the constitutional doctrine at issue in this case-- sets forth a foundational principle of our system of separated powers and checks and balances precisely because it acts in support of the logical proposition that just as no branch may act to breach the authority of another, so too may no branch act to breach its own authority by relinquishing it to another branch.[22] And despite what is suggested by the Chief Justice, separation-of-powers disputes do not invariably give rise to something akin to a "political

---

[22] "To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained?" *Marbury v Madison*, 5 US (1 Cranch) 137, 176; 2 L Ed 60 (1803).

question" to be avoided by the judiciary and resolved exclusively by the quarreling branches themselves. When President Nixon asserted his "executive privilege" to disregard a subpoena from a special prosecutor, it was no "political question"; when President Clinton asserted his authority to dismiss a lawsuit on "presidential immunity" grounds, it was no "political question"; when Congress asserted its authority to exercise a one-house legislative veto, it was no "political question"; and when Presidents have claimed the authority to issue executive orders, to impound appropriated funds, or to exercise line-item vetoes, these too did not invariably become "political questions."[23] Similarly, that the political process itself may afford potential relief to an aggrieved party does not, as the Chief Justice suggests, somehow relieve the judiciary of its obligation to expound upon the meaning of the law and the Constitution.

Second, the Chief Justice suggests that we have "announced" a new principle as part of the nondelegation doctrine because, while caselaw from the United States Supreme Court and this Court "require *some* standards for the delegation of legislative authority," such that "in theory, an inadequate standard would be insufficient," "until today, the United States Supreme Court and this Court have struck down statutes under the nondelegation doctrine only when the statutes contained *no* standards to guide the decision-maker's discretion." However, it is not this majority that has "announced" any novel proposition; rather, it is the Chief Justice who has announced a new principle by stating that repeated

---

[23] See *United States v Nixon*, 418 US 683; 94 S Ct 3090; 41 L Ed 2d 1039 (1974); *Clinton v Jones*, 520 US 681; 117 S Ct 1636; 137 L Ed 2d 945 (1997); *Chadha*, 462 US 919; *Trump v Hawaii*, 585 US ___; 138 S Ct 2392; 201 L Ed 2d 775 (2018); *Train v City of New York*, 420 US 35; 95 S Ct 839; 43 L Ed 2d 1 (1975); *Clinton*, 524 US 417.

judicial statements espousing the necessity of meaningful legislative standards in support of a delegation do not mean what they say. Instead, all that is required is a standard-- some standard, any standard, a standard however illusory or meaningless or ineffectual in achieving its obvious and fundamental purpose-- to transform a delegation of "legislative" power into a delegation of "executive" power. And as a result, the only delegation that will ever *actually* run afoul of the Constitution will be one in which there are "*no* standards to guide the decision-maker's discretion." By this understanding, the Legislature may dissipate and reconfigure its own constitutional authority through empty and standardless delegations, and this Court will have no recourse but to affirm these delegations and acquiesce in the transformation of our system of separated powers and checks and balances, facilitating the dilution of perhaps the greatest constitutional barrier to abuse of public power. We do not believe that such a proposition is supported by either federal or state caselaw, and for good reason.[24] Rather, we have explained that a statute must at least

---

[24] It is questionable to assert that the United States Supreme Court has never invalidated a statute that included some standard. In *Schechter Poultry Corp*, the statute invalidated by the United States Supreme Court as violating the nondelegation doctrine arguably did include a standard: "fair competition." See *Schechter Poultry Corp*, 295 US at 521-522. See also *Whitman*, 531 US at 474 (observing that in *Schechter Poultry Corp*, the Court invalidated a statute "which conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition' "); *Clinton*, 524 US at 486 (Breyer, J., dissenting) ("[*Schechter Poultry Corp*] involved a delegation through the National Industrial Recovery Act, 48 Stat. 195, that contained not simply a broad standard ('fair competition'), but also the conferral of power on private parties to promulgate rules applying that standard to virtually all of American industry.") (citations omitted). But tallying up the number of such cases is not the point and is mere distraction; we acknowledge that there are not a large number of such cases. See note 21 of this opinion. What *is* relevant, however, is this: (a) there is a constitutional test, articulated by both the United States Supreme Court and this Court, imposing limits

"contain[] *sufficient* limits or standards . . . ." *Seaman*, 396 Mich at 308 (emphasis added).

And the United States Supreme Court has used similar language as well. See, e.g.,

*Mistretta*, 488 US at 374 ("[W]e harbor no doubt that Congress' delegation of authority to

the Sentencing Commission is *sufficiently* specific and detailed to meet constitutional

requirements.") (emphasis added). It is a very real and meaningful demand upon this Court

that we ensure that delegations of authority are properly undertaken. As Justice Gorsuch

opined:

> [Enforcing the separation of powers is] about respecting the people's sovereign choice to vest the legislative power in Congress alone. And [it is] about safeguarding a structure designed to protect their liberties, minority rights, fair notice, and the rule of law. So when a case or controversy comes within the judicial competence, the Constitution does not permit judges to look the other way; we must call foul when the constitutional lines are crossed. [*Gundy*, 588 US at ___; 139 S Ct at 2135 (Gorsuch, J., dissenting).]

Third, the Chief Justice also believes that this majority has "announced" a new

principle to the effect that the standards imposed upon the executive must become more

rigorous as the scope of the powers conferred becomes greater. Again, we disagree. As

already noted, the United States Supreme Court has stated that "the degree of agency

discretion that is acceptable varies according to the scope of the power . . . conferred."

*Whitman*, 531 US at 475. It then explained that the standards imposed must be

---

upon excessive delegations of power; (b) that test has regularly been considered and applied by each of those Courts; (c) that test is predicated upon both the language and the logic of our federal and state Constitutions, see, e.g., US Const, art I, § 1; Const 1963, art 4, § 1; Const 1963, art 3, § 2; and (d) there is in the present dispute a delegation of power by the Legislature that is unparalleled in Michigan legal history. The critical question is this-- if the EPGA does not constitute an excessive delegation of power under our Constitution, what ever would?

"substantial" when the scope of the powers conferred is great: "While Congress need not provide any direction to the [Environmental Protection Agency] regarding the manner in which it is to define 'country elevators,' which are to be exempt from new-stationary-source regulations governing grain elevators, see 42 U.S.C. § 7411(i), it must provide substantial guidance on setting air standards that affect the entire national economy." *Id*. Although we are obviously not bound by *Whitman* or the lower federal courts that have applied this same principle, see, e.g., *People v Tanner*, 496 Mich 199, 221; 853 NW2d 653 (2014), it is hardly novel for this Court, as suggested by the Chief Justice, to invoke federal judicial decisions, including those of the United States Supreme Court, for their persuasiveness.

Fourth, the Chief Justice disagrees with our conclusion that the EPGA includes only the words "reasonable" and "necessary" as defining the standards governing the Governor's emergency orders. She states that "[t]he EPGA does not use 'reasonable' or 'necessary' in a vacuum; the Governor's action must be 'reasonable' or 'necessary' to 'protect life and property or to bring the emergency situation within the affected area under control.' " We respectfully disagree concerning the pertinent "standards" in the present analysis. Although we have already quoted from part of Justice Kagan's explanation of a nondelegation analysis in her *Gundy* lead opinion, we do so again with more of the surrounding language:

> [A] nondelegation inquiry always begins (and often almost ends) with statutory interpretation. The constitutional question is whether Congress has supplied an intelligible principle to guide the delegee's use of discretion. So the answer requires construing the challenged statute to figure out what task it delegates and what instructions it provides. [*Gundy*, 588 US at ___; 139 S Ct at 2123 (opinion by Kagan, J.).]

42

Here, the "task" that the EPGA delegates to the Governor is to promulgate "orders, rules, and regulations" to "protect life and property" and to "bring the emergency situation within the affected area under control." MCL 10.31(1). The "instructions," i.e., the standards, that the EPGA provides are that such "orders, rules, and regulations" be "reasonable" and "necessary" for the enumerated tasks. *Id*. Thus, the only standards are that the Governor's orders be "reasonable" and "necessary."

Fifth, to the extent the Chief Justice suggests our decision is inconsistent with the cases of the United States Supreme Court sustaining various broad delegations, we respectfully disagree and find the following sampling of cases illustrative and useful:

In *New York Central Securities Corp v United States*, 287 US 12; 53 S Ct 45; 77 L Ed 138 (1932), the Interstate Commerce Commission (ICC) authorized a set of railroad-system leases pursuant to the Interstate Commerce Act, which provided that the ICC may authorize such leases when in the "public interest." *Id*. at 19, 20 n 1. At issue before the United States Supreme Court was whether the "public interest" standard constituted an invalid delegation because it was "uncertain." *Id*. at 24. The Court sustained the delegation, reasoning as follows:

> Appellant insists that the delegation of authority to the Commission is invalid because the stated criterion is uncertain. That criterion is the "public interest." It is a mistaken assumption that this is a mere general reference to public welfare without any standard to guide determinations. The purpose of the Act, the requirements it imposes, and the context of the provision in question show the contrary. . . . [T]he term "public interest" as thus used is not a concept without ascertainable criteria, but has direct relation to adequacy of transportation service, to its essential conditions of economy and efficiency, and to appropriate provision and best use of transportation facilities, questions to which the [ICC] has constantly addressed itself in the exercise of the authority conferred. [*Id*. at 24-25.]

43

Thus, the standard in *New York Central Securities Corp* was not simply "public interest" but also "adequacy of transportation service," "essential conditions of economy and efficiency," and "appropriate provision and best use of transportation facilities."

In *Fed Radio Comm v Nelson Bros Bond & Mortgage Co*, 289 US 266; 53 S Ct 627; 77 L Ed 1166 (1933), the Court was confronted with a delegation challenge to the Radio Act of 1927, which provided that the Federal Radio Commission may allow radio frequency use by a particular entity " 'from time to time, as public convenience, interest, or necessity requires . . . .' " *Id*. at 279, quoting 47 USC 84. The Court rejected the challenge, reasoning that when 47 USC 84 was read in context, the standard was limited by several specific concerns:

> In granting licenses the commission is required to act "as public convenience, interest or necessity requires." This criterion is not to be interpreted as setting up a standard so indefinite as to confer an unlimited power. . . . The requirement is to be interpreted by its context, by the nature of radio transmission and reception, by the scope, character, and quality of services, and, where an equitable adjustment between states is in view, by the relative advantages in service which will be enjoyed by the public through the distribution of facilities. [*Id*. at 285.]

Thus, the standard in *Fed Radio Comm* was not simply "public convenience, interest, or necessity" but also "the nature of radio transmission and reception," "the scope, character, and quality of services," and in certain cases "the relative advantages in service which will be enjoyed by the public through the distribution of facilities."

In *Yakus v United States*, 321 US 414; 64 S Ct 660; 88 L Ed 834 (1944), the United States Supreme Court considered a nondelegation challenge to § 2(a) of the Emergency Price Control Act, which authorized the "Price Administrator" to fix commodity prices at a level that " 'in his judgment will be generally fair and equitable and will effectuate the

purposes of this Act' . . . ." *Id*. at 420, quoting § 2(a).  In rejecting the challenge, the Court explained:

> The boundaries of the field of the Administrator's permissible action are marked by the statute.  It directs that the prices fixed shall effectuate the declared policy of the Act to stabilize commodity prices so as to prevent war-time inflation and its enumerated disruptive causes and effects.  In addition the prices established must be fair and equitable, and in fixing them the Administrator is directed to give due consideration, so far as practicable, to prevailing prices during the designated base period, with prescribed administrative adjustments to compensate for enumerated disturbing factors affecting prices.  In short the purposes of the Act specified in § 1 denote the objective to be sought by the Administrator in fixing prices—the prevention of inflation and its enumerated consequences.  The standards set out in § 2 define the boundaries within which prices having that purpose must be fixed.  It is enough to satisfy the statutory requirements that the Administrator finds that the prices fixed will tend to achieve that objective and will conform to those standards . . . .  [*Yakus*, 321 US at 423.]

Thus, the standard in *Yakus* was not simply "fair and equitable" but also "prevailing prices during the designated base period" and "administrative adjustments to compensate for enumerated disturbing factors affecting prices."

And in *Whitman*, the United States Supreme Court considered a nondelegation challenge to § 109(b)(1) of the Clean Air Act (CAA), which "instructs the EPA to set 'ambient air quality standards the attainment and maintenance of which in the judgment of the Administrator, based on [the] criteria [documents of § 108] and allowing an adequate margin of safety, are requisite to protect the public health.' "  *Whitman*, 531 US at 472, quoting 42 USC 7409(b)(1) (brackets in original).  In addressing the challenge, the Court first noted its agreement with the Solicitor General's interpretation of § 109(b)(1):

> We agree with the Solicitor General that the text of § 109(b)(1) of the CAA at a minimum requires that "[f]or a discrete set of pollutants and based on published air quality criteria that reflect the latest scientific knowledge,

[the] EPA must establish uniform national standards at a level that is requisite to protect public health from the adverse effects of the pollutant in the ambient air." Requisite, in turn, "mean[s] sufficient, but not more than necessary." [*Id*. at 473 (citations omitted; brackets in original).]

The Court then rejected the challenge:

Section 109(b)(1) of the CAA, which to repeat we interpret as requiring the EPA to set air quality standards at the level that is "requisite" that is, not lower or higher than is necessary—to protect the public health with an adequate margin of safety, fits comfortably within the scope of discretion permitted by our precedent. [*Id*. at 475-476.]

Thus, the standard in *Whitman* was not simply "requisite to protect the public health" but also included consideration of "a discrete set of pollutants" and "published air quality criteria that reflect the latest scientific knowledge." See 42 USC 7408.

As these cases suggest, it reflects an incomplete understanding of United States Supreme Court nondelegation law to assert that vague terms such as "public interest" are ordinarily or typically sufficient to sustain a statute against a nondelegation challenge, even those statutes whose breadth and purview is far more narrow than that of the EPGA. Indeed, if the Chief Justice is correct that a statute only violates the nondelegation doctrine when "the statute[] contain[s] *no* standards to guide the decision-maker's discretion," *why* would the United States Supreme Court continually hear such appeals only to decide whether the standards in these cases are *sufficient*?

Sixth, in the end, if the standards in support of the EPGA's delegation of power satisfy the Constitution, our response can only be: what standards would ever *not satisfy* the Constitution? As laid out earlier in this opinion, the EPGA confers an unprecedentedly broad power in Michigan that is restrained by only two words-- "reasonable" and "necessary"-- that do almost nothing to cabin either the authority or the discretion of the

46

person in whom this power has been vested. Put simply, and our criticism is not of the Governor in this regard but of the statute in dispute-- almost certainly, no individual in the history of this state has ever been vested with as much concentrated and standardless power to regulate the lives of our people, free of the inconvenience of having to act in accord with other accountable branches of government and free of any need to subject her decisions to the ordinary interplay of our system of separated powers and checks and balances, with even the ending date of this exercise of power reposing exclusively in her own judgment and discretion. It is in no way to diminish the present pandemic for this Court to assert, as we now do, that with respect to the most fundamental propositions of our system of constitutional governance, with respect to the public institutions that have most sustained our freedoms over the past 183 years, there must now be some rudimentary return to normalcy.

Finally, we observe in response to the Chief Justice that this decision should be understood as it has been explained throughout this opinion. It is not, we believe, a decision that does anything other than apply *ordinary* principles of administrative law, essentially balancing the required specificity of legislative standards that must accompany a grant of delegated powers with the breadth of those powers. What principally is *extraordinary* in this case is the scope of the statute under consideration, the EPGA, and the expansiveness of the authority it concentrates in a single public official. We do not believe that the conflation of circumstances giving definition to the delegated powers in this case-- the breadth of the delegation, the indefiniteness of the delegation, and the inadequacy of the standards limiting the delegation-- will soon come before this Court again. We have not sought here to *redefine* the constitutional relationship between the legislative and executive

47

branches but only to *maintain* that relationship as it has existed for as long as our state has been a part of this Union. Although singular assertions of governmental authority may sometimes be required in response to a public emergency-- and the present pandemic is clearly such an emergency-- the sheer magnitude of the authority in dispute, as well as its concentration in a single individual, simply cannot be sustained within our constitutional system of separated powers.

## V. CONCLUSION

We conclude that the Governor lacked the authority to declare a "state of emergency" or a "state of disaster" under the EMA after April 30, 2020, on the basis of the COVID-19 pandemic. Furthermore, we conclude that the EPGA is in violation of the Constitution of our state because it purports to delegate to the executive branch the legislative powers of state government-- including its plenary police powers-- and to allow the exercise of such powers indefinitely. As a consequence, the EPGA cannot continue to provide a basis for the Governor to exercise emergency powers.[25]

Stephen J. Markman
Brian K. Zahra
David F. Viviano (as to Parts III(A), (B), (C)(2), and IV)
Elizabeth T. Clement

---

[25] We note that majorities of this Court have joined in full Part III(B) of this opinion, in which we hold that the Governor lacked the authority to declare a "state of emergency" or a "state of disaster" under the EMA after April 30, 2020, and Part III(C)(2), in which we hold that the EPGA is unconstitutional. The former is a unanimous holding of this Court.

48

STATE OF MICHIGAN

SUPREME COURT

---

*In re* CERTIFIED QUESTIONS FROM
THE UNITED STATES DISTRICT
COURT, WESTERN DISTRICT OF
MICHIGAN, SOUTHERN DIVISION

---

MIDWEST INSTITUTE OF HEALTH,
PLLC, d/b/a GRAND HEALTH
PARTNERS, WELLSTON MEDICAL
CENTER, PLLC, PRIMARY HEALTH
SERVICES, PC, and JEFFERY GULICK,

      Plaintiffs,

v

                                       No. 161492
                                       USDC-WD: 1:20-cv-414

GOVERNOR OF MICHIGAN, MICHIGAN
ATTORNEY GENERAL, and MICHIGAN
DEPARTMENT OF HEALTH AND
HUMAN SERVICES DIRECTOR,

      Defendants.

---

VIVIANO, J. (*concurring in part and dissenting in part*).

According to the Centers for Disease Control and Prevention, the severe acute respiratory disease known as COVID-19 has been involved in the deaths of thousands of Michiganders and over 190,000 people nationwide.[1] There is little doubt that COVID-19

---

[1] See Centers for Disease Control and Prevention, *Provisional Death Counts for Coronavirus Disease 2019 (COVID-19)*

is one of the most significant public-health challenges our state has ever faced. To limit the spread of the disease, Governor Gretchen Whitmer has issued scores of executive orders regulating many of the daily activities of our state's inhabitants. It is not the Court's place here to adjudge the efficacy or reasonableness of those orders. Instead, we must determine whether they are lawful, i.e., whether the power the Governor has asserted in issuing those orders is validly claimed under the Constitution and laws of this state.

While the majority decides this case on constitutional grounds, I believe it is easily resolved by the correct interpretation of the statute at issue, the Emergency Powers of the Governor Act of 1945 (the EPGA), MCL 10.31 *et seq.* Contrary to the majority, I would conclude that the EPGA does not allow for declarations of emergency to confront public-health events like pandemics. In light of this conclusion, it would be unnecessary to decide the constitutional question of whether the EPGA violates the separation of powers. Yet, because the rest of the Court, both majority and dissent, have interpreted the statute much more broadly, I believe it is incumbent upon me to decide the constitutional issue as well. In doing so, I agree with the majority and join its analysis holding that the EPGA (under the majority's construction) is an unconstitutional delegation of legislative power. I also agree with the majority that the Governor lacked authority to renew her declarations under the Emergency Management Act (the EMA), MCL 30.401 *et seq.* Accordingly, I join Parts III(A), (B), (C)(2), and IV of the majority opinion and concur in part and dissent in part.

---

<https://www.cdc.gov/nchs/nvss/vsrr/covid19/index.htm> (accessed October 1, 2020) [https://perma.cc/8HKP-SN6A].

2

## I.  THE EPGA: HISTORY, TEXT, AND CONTEXT

The EPGA's history is a good place to begin because, in this case, it helps illuminate the statute's meaning.[2]  In the summer of 1943, a little less than two years before the EPGA's enactment, Detroit experienced a violent riot sparked by racial tensions.  Thousands of soldiers entered the city, 34 individuals were killed, property damages amounted to $2 million, and countless injuries occurred.  Capeci & Wilkerson, *Layered Violence: The Detroit Rioters of 1943* (Jackson: University Press of Mississippi, 1991), pp 17-18.  One of the most difficult problems officials faced was how to authorize the use of federal troops to control the rioting.  See Shogan & Craig, *The Detroit Race Riot: A Study in Violence* (New York: Da Capo Press, 1976), pp 68-76.  Although thousands of police officers had been deployed, officials believed that something more was needed.  *Id*. at 70.  In the midst of the crisis, Governor Harry Kelly was informed that martial law had to be declared in order to obtain federal assistance.  *Id*. at 75-76.  That would have required suspending all local and state laws in the city, depriving the city council and police departments of all authority, and suspending state-government operations in the area.  *Id*.

Understandably, Governor Kelly was reluctant to take that step.  *Id*.  Instead, without relying on any apparent authority, he proclaimed a " 'state of emergency,' " authorizing the use of the "State Troops"—at that time, an "inexperienced" and "volunteer organization

---

[2] It is true that we generally do not look to contemporaneous history when interpreting a statute unless its meaning is doubtful.  See *People v Hall*, 391 Mich 175, 191; 215 NW2d 166 (1974).  I believe the correct interpretation of the EPGA—that it does not encompass public health—is not doubtful.  But given the significance of the issues at stake in this case, and that a majority of a Court of Appeals panel, the Court of Claims, and my colleagues here have all reached a different conclusion, it is worth examining whether the historical context supports or undermines my conclusion.

set up . . . to replace National Guard units called into federal service during" World War II. *Id*. at 76-77, 79. In his proclamation, Governor Kelly also banned the sale of alcohol, closed "[a]ll places of amusement," established a curfew, and prohibited assembly and the carrying of weapons. Kelly, Declaration and Proclamation (June 21, 1943), reprinted in *The Detroit Race Riot*, pp 144-145. Later the same day, federal officials found a way to offer assistance short of declaring martial law. *The Detroit Race Riot*, p 80. President Franklin D. Roosevelt issued a presidential proclamation, and army troops moved in to bring the situation under control. *Id*. at 80-82, 153-154.

When the EPGA was introduced and enacted in 1945, it was well known that the legislation stemmed from the recent race riot and the perceived inability to order troops without declaring martial law; indeed, when it was first introduced in the Legislature, it was dubbed the "Anti-Riot Bill."[3] The text reflects this emphasis. The first section is the most important for our purposes. Its first sentence describes when and how the statute may be invoked:

> *During times of great public crisis, disaster, rioting, catastrophe, or*
> *similar public emergency within the state, or reasonable apprehension of*

---

[3] See *Senators Offer Anti-Riot Bill*, Detroit Free Press (April 7, 1945), p 2 ("A bill to equip the Governor with authority to deal with rioting without declaring martial law was introduced in the Senate . . . . [Senator] Hittle said the bill was proposed by State Police Commissioner Oscar H. Olander and results from experience in the 1943 Detroit riot."); see also *Governor Gets Great Powers: Can Suppress Civil Disorders Quickly*, The Herald-Press (May 26, 1945), p 2 (noting that the law gives "wide powers to suppress civil disorder without proclaiming martial law" and "was requested by state police as an aftermath of the Detroit race riots" due to their discovery that "there was no middle ground legally between minor laws forbidding unlawful assembly and the drastic ordering of martial law, suspending civil rights"); The Sebewaing Blade (May 4, 1945), p 2 ("This measure is designed to remedy a legal handicap which arose in the Detroit race riots two years ago . . . .").

*immediate danger of a public emergency of that kind, when public safety is imperiled*, either upon application of the mayor of a city, sheriff of a county, or the commissioner of the Michigan state police or upon his or her own volition, the governor may proclaim a state of emergency and designate the area involved. [MCL 10.31(1) (emphasis added).]

The provision for proclaiming "a state of emergency" very clearly reflects Governor Kelly's declaration, which used the same term (albeit without any statutory authorization to do so).

The second two sentences pertain to the scope of the Governor's authority to address an emergency situation once an emergency has been declared:

After making the proclamation or declaration, the governor may promulgate reasonable orders, rules, and regulations as he or she considers necessary to protect life and property or to bring the emergency situation within the affected area under control. Those orders, rules, and regulations may include, but are not limited to, providing for the control of traffic, including public and private transportation, within the area or any section of the area; designation of specific zones within the area in which occupancy and use of buildings and ingress and egress of persons and vehicles may be prohibited or regulated; control of places of amusement and assembly and of persons on public streets and thoroughfares; establishment of a curfew; control of the sale, transportation, and use of alcoholic beverages and liquors; and control of the storage, use, and transportation of explosives or inflammable materials or liquids deemed to be dangerous to public safety. [*Id.*]

The list of possible emergency orders comes, in large part, from the 1943 proclamation. Both speak of controlling "places of amusement" and "assembly," and both contain provisions for curfews and prohibitions on the "sale . . . of alcoholic beverages." And as originally passed, the EPGA also allowed the Governor "control of the possession, sale, carrying and use of firearms [and] other dangerous weapons," 1945 PA 302(1), repealed by 2006 PA 546, just as the proclamation had prohibited the carrying of "arms or weapons of any description," Kelly, Declaration and Proclamation (June 21, 1943), reprinted in *The*

5

*Detroit Race Riot*, p 145. Thus, the very structure of the act and its key terms largely reflect the 1943 proclamation.

The second section also describes the powers the Governor wields once an emergency has been declared, but as the Governor's counsel conceded at argument, this section does not address or expand the types of situations that qualify as emergencies:

> It is hereby declared to be the legislative intent to invest the governor with sufficiently *broad power of action in the exercise of the police power of the state* to provide adequate control over persons and conditions during such periods of impending or actual public crisis or disaster. The provisions of this act shall be broadly construed to effectuate this purpose. [MCL 10.32 (emphasis added).]

The final section makes it a misdemeanor to violate rules or orders prescribed pursuant to the statute. MCL 10.33.

The dispositive issue here is whether this statute applies in the sphere of public health generally or to an epidemic like COVID-19 in particular. The statute provides a list of events—for example, disaster, rioting, and catastrophe—justifying a declaration of emergency. MCL 10.31(1). But tacked to the end of the list is the stipulation that the Governor may take such action only "when public safety is imperiled." The Attorney General in this case has correctly recognized that it modifies the entire series that precedes it. See generally Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (St. Paul: Thomson/West, 2012), p 147 (straightforward, parallel constructions of nouns in a series are normally all modified by postpositive modifiers). In other words, not just any catastrophe will do; it must be one that imperils "public safety."

The Governor reads "public safety" expansively to encompass "public health." She does not provide a source defining this exact term, however. By itself, the ordinary

6

meaning of "safety" at the time the EPGA was enacted in 1945 might lend some support to the Governor's reading. The dictionary she cites defined safety as the "[c]ondition of being safe; freedom from danger or hazard." *Webster's New Collegiate Dictionary* (1949). "Safety" could, therefore, cover health issues.[4] But, as we shall see below, four justices from this Court read the same lay dictionary definition (from an earlier edition) as excluding health considerations. *Chicago & N W R Co v Pub Utilities Comm*, 233 Mich 676, 696; 208 NW 62 (1926) (opinion by SHARPE, J.). Moreover, we are looking for the meaning of "public safety." None of the everyday dictionaries defines that term. Nor do the legal dictionaries from the period. See, e.g., *Black's Law Dictionary* (4th ed).

The statutory context makes clear that the EPGA uses "public safety" as a term of art with a narrower meaning than the one the Governor posits. Recall that MCL 10.32 gives the Governor "sufficiently broad power of action in the exercise of the *police power* of the state . . . ." (Emphasis added.) As we have explained, "It has been long recognized that the state, pursuant to its inherent police power, may enact regulations to promote the public health, safety, and welfare." *Blue Cross & Blue Shield of Mich v Milliken*, 422 Mich 1, 73; 367 NW2d 1 (1985); see also *Osborn v Charlevoix Circuit Judge*, 114 Mich 655, 664; 72 NW 982 (1897) (same). In other words, "public safety" was one of the objectives for which the police power could be exercised; so was "public health." See Legarre, *The Historical Background of the Police Power*, 9 U Pa J Const L 745, 791 (2007) (noting caselaw standing for the proposition "that the state's police power existed only for certain limited objectives, namely, the promotion of public health, safety, and morals").

---

[4] The last entry in *Webster's* definition for "safety" characterized it as "[a] keeping of oneself or others safe, esp. from danger of accident or disease." *Id*.

Thus, when terms from the police-power context like "public safety" crop up in statutes, as they frequently do, courts treat them as terms of art. Cf. *Lincoln Ctr v Farmway Co-Op, Inc*, 298 Kan 540, 552; 316 P3d 707 (2013) (noting that the meaning of the terms "public health" and "public safety" is "widely understood in legal circles"); *CLEAN v Washington*, 130 Wash 2d 782, 804; 928 P2d 1054 (1996) (en banc) (noting that the "terms 'public peace, health or safety' " are "synonymous with an exercise of the State's 'police power' "). In light of the lengthy history and pervasive use of the terms "police power" and "public safety," the Legislature's intent in employing them in the EPGA is unmistakable. By invoking "public safety" and placing it alongside "police power," the Legislature incorporated the specialized legal meanings of these terms.

Another contextual clue supports this conclusion. If the term "public safety" is given the ordinary meaning offered by the Governor and embraced by the majority, it would render as surplusage the phrase "when public safety is imperiled." Courts, however, strive to avoid interpretations that read statutes as containing terms that are surplusage or nugatory. *People v Pinkney*, 501 Mich 259, 282; 912 NW2d 535 (2018). As noted, the full phrase—"when public safety is imperiled"—modifies the entire preceding list of triggering events (i.e., "times of great public crisis, disaster, rioting, catastrophe, or similar public emergency within the state"). The term "public" already precedes and modifies this list, so interpreting it under its ordinary meaning in the phrase "public safety" inevitably leads to surplusage. And by defining "safety" broadly as " 'the condition of being safe from undergoing or causing hurt, injury, or loss,' " the majority also fails to give it any real meaning. It is hard to imagine a "great . . . crisis, disaster, riot[], catastrophe, or similar public emergency" that does not risk "causing hurt, injury, or loss" to "people in general."

8

Thus, ignoring context and reading "public safety" as a term of ordinary meaning renders it nugatory by giving it no meaning at all.

So our task is to decide whether "public safety," as a term of art related to the "police power," includes public-health issues like epidemics.

## II. THE DISTINCTION BETWEEN PUBLIC SAFETY AND PUBLIC HEALTH

### A. CASELAW

The distinction between "public safety" and "public health" is borne out in caselaw from this Court and others.[5]  Most directly, in 1931 this Court defined public safety as it was used in a constitutional provision allowing laws to take immediate effect if necessary " 'for the preservation of the public peace, health or safety,' " i.e., if they invoked the police power.  *Naudzius v Lahr*, 253 Mich 216, 227; 234 NW 581 (1931) (citation omitted).  Our core interpretation suggests that public health is not within the scope of "public safety": " 'Laws in regard to "public safety" are allied in their application and effect to those enacted to promote the public peace, preserve order, and provide that security to the individual which comes from an observance of law.' "  *Id*. at 228, quoting *Pollock v Becker*,

---

[5] The distinction stretches at least as far back as Lord Blackstone, who distinguished offenses against the "public peace" (e.g., murder, public fighting, and destruction of public property) and offenses against "public health," which involved communicable diseases.  4 Blackstone, Commentaries on the Laws of England, pp **142-149, 161.  Blackstone's contemporary, Jeremy Bentham, similarly carved up the police powers "into eight *distinct* branches," including "the prevention of offences," "the prevention of calamities," and "the prevention of endemic diseases."  Bentham, *A General View of a Complete Code of Laws*, in 3 Bentham, The Works of Jeremy Bentham (Bowring ed, 1843), p 169 (emphasis added).

9

289 Mo 660; 233 SW 641, 649 (1921) (en banc).  This definition of "public safety" matches others from both that period and now.[6]

Our adoption of *Pollock*'s definition is particularly meaningful because *Pollock* was interpreting a similar constitutional provision and went on to define each of the terms in that provision.  "Public peace," according to *Pollock*, was "that quiet, order and freedom from disturbance guaranteed by law." *Pollock*, 233 SW at 649.  "By the 'public health,' " the court explained, "is meant the wholesome sanitary condition of the community at large." *Id*.

We had also acknowledged the distinctions earlier in *Newberry v Starr*, 247 Mich 404; 225 NW 885 (1929).  Examining the same constitutional provision, we answered whether an act creating school districts could be given immediate effect because it bore "any real or substantial relation to preservation of public health, peace, or safety[.]" *Id*. at 411.  We treated these as three separate categories, noting that "school districts have most important duties relating to preservation of health," during such epidemics, "and less important duties respecting peace and safety," including building safety and the safety of students in attendance. *Id*.

We again addressed the distinction in *Chicago*, 233 Mich at 699 (opinion by SHARPE, J.).  There, a state law requiring cab curtains for the health of railroad employees

---

[6] See Graves, *American State Government* (Boston: DC Heath & Co, 3d ed, 1946), p 784 (stating that public safety included laws on criminal control, protection of life and property, industrial safety, fireworks, firearms, building codes, and motor vehicles); 16A CJS, Constitutional Law (June 2020 update), § 707 (stating that public-safety laws concern "dangerous persons, restraining dangerous practices, and prohibiting dangerous structures") (citations omitted).

10

was challenged as conflicting with federal railroad legislation that expressly stated its purpose was safety. Justice SHARPE, writing for four justices on a Court of eight, explained:

> In my opinion, the words "health" and "safety," as used in these acts, are not synonymous terms. "Health" is defined by Webster as "The state of being hale, sound, or whole, in body, mind, or soul; especially, the state of being free from physical disease or pain," and "safety" as "freedom from danger or hazard; exemption from hurt, injury, or loss." While some of the safety provisions of the federal acts may tend to protect the health of the employees, such protection is but incidental to the main purpose, that of safeguarding the lives and limbs of the employees and protecting th[at] which is being transported, be it passengers or freight. [*Id*. at 696.][7]

Thus, four justices rejected the conflation of safety and health, using an earlier version of the same dictionary the Governor cites here. The other four justices did not reject this argument but instead thought the federal legislation "covered 'the entire locomotive and tender and all their parts' . . . ." *Id*. at 689.[8]

And the distinction has persisted in more recent cases from our sister state courts as well. In *Olivette v St Louis Co*, 507 SW3d 637, 638, 645-646 (Mo App, 2017), the court

---

[7] That conclusion reflected the majority position of the Wisconsin Supreme Court in *Chicago & N W R Co v R Comm of Wisconsin*, 188 Wis 232; 205 NW 932, 934 (1925) ("[T]he public health and the public safety afford two distinct fields of legislation. It is true that to some extent regulations promoting public safety also promote public health, but that fact alone cannot make a health regulation of a regulation distinctly in the interest of safety."), rev'd on other grounds by *Napier v Atlantic Coast Line R Co*, 272 US 605 (1926).

[8] That was also the conclusion of the United States Supreme Court when it decided the issue in *Napier v Atlantic Coast Line R Co*, 272 US 605; 47 S Ct 207; 71 L Ed 432 (1926). Again, the distinction drawn between health and safety was not rejected, however. The Court merely observed that regulations for health or comfort may incidentally promote safety. *Id*. at 611-612.

rejected a county's effort to ground an ordinance establishing minimum police-force standards on a 1945 statute allowing it to promulgate rules to promote the " 'public health' " and prevent contagious diseases. *Id*. at 642 (citation omitted). In doing so, the court declined to adopt a broad definition of "public health," noting that the legislature had created "different departments to address 'public safety' and 'public health,' " indicating that "it considers these two different and distinct areas of government authority." *Id*. at 645. In addition, the Legislature had enacted numerous statutes distinguishing the terms, "such as in the phrase 'public health, safety and welfare[.]' " *Id*.; see also *Winterfield v Palm Beach*, 455 So 2d 359, 361 (Fla, 1984) ("At the very least, the public safety purpose of the police and fire projects is separate and distinct from the public health purpose of the sewer projects.").

## B. STATUTORY CONTEXT

The statutory structure in place when the Legislature enacted the EPGA also confirms the distinct meanings of "public safety" and "public health" and demonstrates that the Legislature did not mean to conflate the two concepts in the EPGA.

As far back as 1873, the Legislature had created the State Board of Health (the Board), which was given "general supervision of the interests of the health and life of the citizens of this State." 1873 PA 81, § 2.[9] The Board was to "make sanitary investigations and inquiries respecting the causes of disease, and especially of epidemics[.]" *Id*. Around

---

[9] Even further back, our earliest statutes devoted a separate statutory title to "Public Health" (providing for local boards of health and quarantines, among other things), as distinct from the title dealing with the "Internal Police of the State" (providing for the regulation of disorderly persons, taverns, and "the law of the road," among other things). See 1838 RS, Part 1, Titles VIII and IX.

the same time, the Legislature enacted a framework for localities to address contagious diseases, once again under the rubric of "health" rather than "safety." In 1883, the Legislature authorized municipal health officers to investigate any outbreaks of "communicable disease dangerous to the public health" and order isolation of the sick, require vaccinations, and mandate other sanitary measures to combat the disease. 1883 PA 137, § 1. Violations of the health officer's orders was a finable offense. 1883 PA 137, § 2. Ten years later, the Legislature granted similar powers to the State Board of Health, allowing it to isolate individuals suspected of having communicable diseases—the Governor's only role was to draw money from the general fund for the Board's use. 1893 PA 47.

The statutory structure in place in 1945 took shape in the wake of the influenza epidemic of 1918. In the midst of that epidemic, Governor Albert Sleeper banned by order various public meetings. *State Closing is "Flu" Order*, Lansing State Journal (October 19, 1918), p 1. The order did not cite any authority allowing the Governor to take such action, but the closures lasted only a few weeks. *Id*. (reprinting order); *Governor Lifts "Flu" Ban*, The Sebewaing Blade (November 7, 1918), p 1. Perhaps in response, just months after the ban, the Legislature overhauled the statutory framework for addressing statewide epidemics and public health more generally. In an act "to protect the public health," the Legislature replaced the State Board of Health with a State Health Commissioner, who was given authority over the health laws as well as public meetings. 1919 PA 146, §§ 1, 2, and 9.

As things stood in 1945, the Commissioner had "general charge and supervision of the enforcement of the health laws" of the state. 1948 CL 325.2.[10] And there was a lot to supervise—the health code stretched over multiple chapters and sections, involving statistics, local health boards, handling of dead bodies, mental diseases, hospitals, and communicable diseases, among others. One of the first provisions in the code came from 1919 PA 146, § 9—the section of the act addressing public meetings:

> In case of an epidemic of any infectious or dangerous communicable disease within this state or any community thereof, the state health commissioner may, if he deem it necessary to protect the public health, forbid the holding of public meetings of any nature whatsoever except church services which may be restricted as to number in attendance at 1 time, in said community, or may limit the right to hold such meetings in his discretion. Such action shall not be taken, however, without the consent and approval of the advisory council of health. . . . Such order shall be signed by the health commissioner and if applicable to the entire state be countersigned by the governor. [1948 CL 325.9]

An entire chapter of the code contained detailed provisions applicable to communicable diseases. Upon finding that, among other things, a "dangerous communicable disease" existed inside or outside the state "whereby the public health is imperiled," the State Health Commissioner was "authorized to establish a system of quarantine for the state of Michigan and the governor shall have authority to order the state militia to any section of the state on request of the state board of health to enforce such quarantine." 1948 CL 329.1. The purpose of the quarantine was to prevent travel within the state and detain individuals exposed to the disease. 1948 CL 329.2. Railroad cars and "public or private conveyances" could also be detained under rules produced by the

---

[10] Although the citations are to the 1948 compiled laws, all statutes cited appeared the same in 1945.

Commissioner if they contained persons or property carrying the infection, which could then be isolated. 1948 CL 329.3. Violation of the Commissioner's rules was a misdemeanor. 1948 CL 329.6.

Local health boards also played a large role in the response to epidemics. Most directly, local health boards had authority to quarantine those "infected with a dangerous communicable disease." 1948 CL 327.15; see also 1948 CL 327.27 and 1948 CL 327.28 (allowing townships to set up quarantine grounds and establish joint quarantine areas); 1948 CL 327.29 (permitting the township board of health to quarantine vessels). Localities bordering other states could examine any travelers from "infected places in other states" for "any infection which may be dangerous to the public health" and restrain their entry if necessary. 1948 CL 327.17. Localities could also establish hospitals specifically for dealing with any "disease which may be dangerous to the public health." 1948 CL 327.35.[11] During outbreaks, the township board of health had to "immediately provide such hospital[s]" or places for the infected and had to remove infected individuals to that place. 1948 CL 327.39; 1948 CL 327.40. Boards of health had a general duty to "use all possible care to prevent the spreading of the infection . . . ." 1948 CL 327.41. Many other statutes mentioned both "health" and "safety," indicating that these terms had different meanings—if they meant the same thing, the Legislature would not likely have used each term. See, e.g., 1948 CL 42.17 (providing that charter townships had the same authority

---

[11] See also 1948 CL 327.49 (applying township standards to cities and villages); 1948 CL 331.202 (authorizing certain counties to build and maintain "a hospital for the treatment of persons suffering from contagious and infectious diseases"); 1948 CL 67.52 (authorizing village councils to provide for a hospital for persons with infectious or contagious diseases and authorizing the council to order detention and treatment of those individuals).

15

as cities "to provide for the public peace and health and for the safety of persons and property").

Other provisions, both in the health code and elsewhere, constructed elaborate rules on how epidemics were to be handled, spanning from the appointment of state medical officials to specific instructions for railroads and summer resorts to criminal penalties for spreading communicable diseases.[12]

An entirely different batch of statutes addressed public safety.[13] Just as it had announced when it was legislating for "public health," the Legislature did so with "public

_____

[12] See, e.g., 1948 CL 329.4 and 1948 CL 329.5 (disinfection of persons and property); 1948 CL 329.51 (appointment of a state medical inspector); 1948 CL 325.23 (creating a state bacteriology position tasked with examining and analyzing materials "in localities where there is an outbreak of any contagious disease or epidemic" if the examination or analysis was "necessary to the public health and welfare"); 1948 CL 327.43 (providing duties with regard to any "disease dangerous to the public health" in boarding houses and hotels); 1948 CL 327.44 (obligating physicians to report any cases of diseases "dangerous to the public health"); 1948 CL 125.485 (allowing an officer of the health department to order that a dwelling be vacated if it was "infected with contagious disease"); 1948 CL 462.5(a) (prohibiting railroads from offering free transportation except in limited circumstances, including offering free passage "with the object of providing relief in cases of general epidemic, pestilence or otherwise calamitous visitation"); 1948 CL 455.212 (allowing the board of summer resorts to enact bylaws "to protect all occupants from contagious diseases and to remove from said lands any and all persons afflicted with contagious diseases"); 1948 CL 750.473 ("No person sick with . . . any other communicable disease, dangerous to the public health, and no article which has been infected or is liable to propagate or convey any such disease, shall come or be brought into any township, city or village in Michigan . . . ."); 1948 CL 125.757d (requiring owners of trailer-coach parks to report to a board of health any person suspected of having a "communicable disease").

[13] It is true that a few health statutes mentioned "safety" or "public safety." For example, the statute allowing local boards of health to quarantine individuals with diseases gave the boards the power to "make effectual provision in the manner in which it shall judge best for the safety of the inhabitants and it may remove such sick or infected person to a separate house or hospital . . . ." 1948 CL 327.15. But it seems likely that the Legislature invoked safety because these statutes involved removing individuals. That would explain why the

16

safety." The title to the 1935 legislation creating the state police began, "An Act to provide for the public safety[.]" 1935 PA 59, title. In creating the state police, the Legislature transferred to it the "department of public safety" and made the state police commissioner the state's deputy oil inspector and fire marshal. 1948 CL 28.5; 1948 CL 28.13 ("Whenever reference is made in any law to the 'commissioner of public safety' or to the 'department of public safety' such reference shall be construed to mean, respectively, the commissioner of the Michigan state police and department of Michigan state police . . . ."). In other words, the state had a separate department assigned to "public safety," and it fell within the state police force's purview. None of the relevant statutes regarding that department or the police force referred to epidemics or communicable diseases.[14] Rather, the police were assigned to enforce the criminal laws. 1948 CL 28.6. Other matters also fell within the concept of public safety, such as highway traffic regulation. In 1941, the Legislature

---

Legislature provided for justices of the peace to make out warrants directing law enforcement to conduct the removals. 1948 CL 327.18. Other courts have made this connection. See *Haverty v Bass*, 66 Me 71, 73 (1874) ("[The statute] enables [officials charged with enforcing the statute] to command the services of others. It might be difficult to obtain the necessary assistance, in an undertaking so hazardous to health. But, by means of a warrant, they can compel executive officers to act. They can remove a sick person without the aid of a warrant, or they can use that instrumentality to enforce obedience to their commands, if a resort to such means of assistance becomes necessary."). For this reason, the cases cited by the majority that addressed statutes referring to both health and safety—*Jacobson v Massachusetts*, 197 US 11, 37; 25 S Ct 358; 49 L Ed 643 (1905); *People ex rel Hill v Lansing Bd of Ed*, 224 Mich 388, 391; 195 NW 95 (1923)—are distinguishable.

[14] Some statutes regulating the police mentioned "public health." The title to one such act for inspection of kerosene and petroleum products referred to "the protection of public health and safety[.]" 1939 PA 114, title. Of course, an explosive substance poses a safety risk unlike an epidemic, and thus it makes sense that it would fall under the purview of the police.

17

created the "Michigan state safety commission" for the express purpose of "promot[ing] . . . greater safety on the public highways and other places within the state . . . ." 1941 PA 188, title.

This was the state of the law in 1945 when the Legislature passed the EPGA. These statutes, like the caselaw, support the conclusion that "public health" and "public safety" represented distinct legal concepts. The statutory context does more than that, however. Reading the EPGA in light of this context also demonstrates how improbable it is that the Legislature meant to depart from the historical understanding of "public safety" by expanding the concept to include "public health" emergencies.

In general, we interpret statutes in the manner "most compatible with the surrounding body of law into which the provision must be integrated[.]" *Green v Bock Laundry Machine Co*, 490 US 504, 528; 109 S Ct 1981; 104 L Ed 2d 557 (1989) (Scalia, J., concurring). The statutory terms and phrases a court interprets are not only part of a whole statute but more broadly are "part of an entire *corpus juris*. So, if possible, it should no more be interpreted to clash with the rest of that corpus than it should be interpreted to clash with other provisions of the same law." *Reading Law*, p 252. One way we do so is by adhering to the "cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant." *Kungys v United States*, 485 US 759, 778; 108 S Ct 1537; 99 L Ed 2d 839 (1988) (plurality opinion by Scalia, J.); see also *Grimes v Dep't of Transp*, 475 Mich 72, 89-90; 715 NW2d 275 (2006) (courts avoid interpretations that render text surplusage). "If possible, every word and every provision is to be given effect . . . . None should needlessly be given an interpretation that causes it to duplicate another provision . . . ." *Reading Law*, p 174. In a like manner, when a statute specifically

18

addresses a topic, that statute will control over a more general statute that might otherwise apply.  See *TOMRA of North America, Inc v Dep't of Treasury*, ___ Mich ___, ___; ___ NW2d ___ (2020) (Docket Nos. 158333 and 158335); slip op at 13-14.

The Governor's broad reading of the EPGA does not comport with these longstanding interpretive principles.  For her to be correct, we would have to assume that the Legislature in 1945 meant to lay waste to the extensive statutory provisions specifically addressing epidemics and communicable diseases.  Under her reading, this body of statutory law would have been mere surplusage.  An epidemic would constitute a "public safety" event justifying a state of emergency.  At that point, the actual "public health" statutes would have been totally eclipsed by a statute that, on its face, does not even refer to public health or epidemics.  The powerful but limited tools given to the Governor and the State Health Commissioner under the health code would have been superfluous—the Governor, applying the EPGA, could have fashioned any tools she thought fit and transgressed any limitations prescribed by the health code.

The same problem arises in the statutory context today.  When the meaning of a term is questionable, as "public safety" might be thought of here, courts should "construe it to contain that permissible meaning which fits most logically and comfortably into the body of both previously and subsequently enacted law."  *West Virginia Univ Hosps, Inc v Casey*, 499 US 83, 100; 111 S Ct 1138; 113 L Ed 2d 68 (1991).  This is "because it is our role to make sense rather than nonsense out of the *corpus juris*."  *Id*. at 101.

19

The Governor's interpretation makes nonsense out of the current body of statutes. Many laws similar to those above remain on the books.[15]  Most notably, the 1919 law passed in the wake of the influenza epidemic and Governor Sleeper's actions is still the law, albeit in slightly modified form.  See MCL 333.2253 (allowing the director of the health department to "prohibit the gathering of people for any purpose and [to] establish procedures to be followed during the epidemic to insure continuation of essential public health services and enforcement of health laws").  But this law is redundant alongside the EPGA.  As if to prove this, the Director of the Department of Health and Human Services (DHHS) has issued a series of orders under MCL 333.2253 simply "reinforcing" key executive orders on COVID-19, such as those mandating masks and instituting the Safe Start Program, which itself contains the Governor's overarching regulatory response to COVID-19 (e.g., remote-work requirements, public-accommodation restrictions, and prohibitions on large gatherings).  *Emergency Order Under MCL 333.2253 – Regarding Executive Orders 2020-153, 2020-160, and 2020-161*, order of the Director of the DHHS,

---

[15] See, e.g., MCL 333.2221(1) (charging the Department of Public Health with the responsibility to "continually and diligently endeavor to prevent disease"); see also MCL 333.2221(2)(a) and (d) (giving the department "general supervision of the interests of the health and life of the people of this state" and making it responsible for investigating "[t]he causes of disease and especially of epidemics"); MCL 333.5115 (the department must establish standards for "the discovery and care of an individual having or suspected of having a communicable disease or a serious communicable disease or infection"); MCL 333.5203(1) (the department must issue warnings to individuals with communicable diseases deemed to be "health threat[s] to others"); MCL 333.5205 (those warnings can be enforced in court); MCL 333.5207 (the individuals can be temporarily detained, tested, and treated); MCL 333.9621 (allowing local health departments, state institutions, and physicians to require microbiological examinations in locations "where there is an outbreak of a communicable disease or epidemic requiring the examination or analysis to protect the public health"); MCL 331.202 (allowing counties with a certain population to construct and maintain hospitals for individuals with "contagious and infectious diseases").

entered July 29, 2020 ("reinforcing" EOs 2020-153, 2020-160, and 2020-161). In other words, nearly everything the Governor has done under the EPGA, she has also purported to do, via the DHHS Director, under MCL 333.2253.

The contextual clues within the EPGA all lead to the same conclusion. To begin with, nowhere does the EPGA refer to terms or tools traditionally associated with public-health emergencies. This stands in stark contrast to the provisions from the 1945 health code discussed above. Those statutes referred to quarantines, removal of the sick, and medical treatment—the common responses to epidemics for centuries. See Zuckerman, *Plague and Contagionism in Eighteenth-Century England: The Role of Richard Mead*, 78 Bull Hist Med 273, 287-289 (2004); Link, *Public Health History: Toward a New Synthesis*, 19 Reviews Am Hist 528, 529 (1991) (book review).

Instead, what we find in the EPGA are terms suggesting safety concerns of the sort law-enforcement agencies have a duty to confront. Consider the nonexhaustive list of example orders the Governor can issue controlling matters such as traffic, places of amusement, alcoholic beverages, and explosives. These all appear to anticipate events like riots, in which the behavior of the public is what poses the safety risk. None of the examples relates to contagious diseases or epidemics. The references to designated "area[s]" and "specific zones" also suggest a focus on safety issues like civil disturbances. Although the statute does not expressly or impliedly limit the geographic scope of the emergency, it was evidently crafted with local emergencies in mind. That focus is also evident in the provision allowing city mayors and county sheriffs to seek emergency declarations. The accommodation for localities seems designed for civil disturbances and the like, not epidemics that could easily spread from place to place across the state. Read

21

as part of the larger statutory context, then, the EPGA suggests a focus on public safety rather than public health.

## C. PRACTICAL CONSTRUCTION OF THE EPGA

Another relevant interpretive consideration is how governors have used and construed the EPGA in the past. See *Westbrook v Miller*, 56 Mich 148, 151-152; 22 NW 256 (1885) (noting that "great deference is always" owed to an executive's practical construction of a statute it enforces); 2B Singer, Sutherland Statutory Construction (7th ed, October 2019 update), § 49:3 (noting that "long-continued contemporaneous and practical interpretation of a statute by executive officers . . . is an invaluable aid to construction" and "is closely related to the doctrine that statutes are given their common and ordinary meaning").

In this regard, although "public health" was mentioned in past emergency declarations and orders under the EPGA, none ever involved public-health emergencies.[16] Rather, prior to the adoption of the EMA in 1976, in the handful of times it was invoked, governors had employed the EPGA for events like riots, energy shortages, and violent strikes or protests. See, e.g., Executive Order No. 1967-3 (riots). Since the passage of the EMA in 1976, the EPGA has been mostly dormant. The only executive order expressly

---

[16] It has been observed that Governor William Milliken ostensibly used the EPGA in 1970 to ban fishing in Lake St. Clair and the St. Clair River due to pollution concerns; two weeks after issuing that order, he issued a similar order banning commercial walleye fishing on Lake Erie. See Van Beek, *A History of Michigan's Controversial 1945 Emergency Powers Law* (August 31, 2020), p 3. But even assuming that this falls within the realm of "public health," Governor Milliken's orders did not cite the EPGA or declare an emergency. Executive Order No. 1970-6; Executive Order No. 1970-7.

citing the EPGA in the past 50 years was in response to an oil spill—but the EMA was also invoked. Executive Order No. 2010-7. That is it.

This limited, practical use of the EPGA was perhaps a result of Governor Milliken's belief, expressed in his "Special Message to the Legislature on Natural Disasters," that the statute was "pertinent to civil disturbances . . . ." 1973 House Journal 861 (No. 41, April 11, 1973). Whatever the reason for its limited use, the Governor's current application of the statute to cover public-health emergencies is unprecedented.[17] Thus, an examination of the statute's prior uses also supports the narrower interpretation given above.

---

[17] Not only is the Governor's use of the statute unprecedented in Michigan, it is unique across the entire country. The statutory authority invoked in the COVID-19 emergency declarations by nearly every other state governor explicitly contemplates public-health emergencies. See Ala Code 31-9-1 and Ala Code 31-9-3(4); Alas Stat 26.23.020(i); Ariz Rev Stat Ann 26-301(15), Ariz Rev State Ann 26-303(D) and Ariz Rev Stat Ann 36-787; Ark Code Ann 12-75-102 and Ark Code Ann 20-7-110; Cal Gov Code 8558; Colo Rev Stat 24-33.5-704.5; Conn Gen Stat 19a-131a; Del Code Ann, tit 20, §§ 3102(2) and 3132(11); Fla Stat 381.00315; Ga Code Ann 38-3-51(a); Hawaii Rev Stat 127A-2; Idaho Code 46-1002 and Idaho Code 46-1007; Ill Comp Stat, ch 20, 3305/4; Ind Code 10-14-3-12 and Ind Code 10-14-3-1; Iowa Code 29C.6(1); Kan Stat Ann 48-904; Ky Rev Stat Ann 39A.020(12); La Stat Ann 29:762; Me Stat, tit 37-B, § 703 and Me Stat, tit 22, § 801(4-A); Md Code Ann, Pub Safety, 14-101(c); Mass Gen Laws, ch 17, § 2A; Minn Stat 4.035(2); Miss Code Ann 33-15-5(g); Mont Code Ann 10-3-103(4); NJ Stat Ann 26:13-2; NM Stat Ann 12-10A-3 and NM Stat Ann 12-10-4(B); NY Exec Law 20 (McKinney); NC Gen Stat 166A-19.3(6); ND Cent Code 37-17.1-04; Ohio Rev Code Ann 5502.21; Okla Stat, tit 63, §§ 683.2(A) and 683.3; Or Rev Stat 401.025; Pa Cons Stat, tit 35, § 7102; RI Gen Laws, tit 30, § 30-15-3; SC Code Ann 25-1-440 and SC Code Ann 44-4-130; SD Codified Laws 34-48A-1; Tenn Code Ann 58-2-102; Tex Gov't Code Ann 418.014; Utah Code Ann 53-2a-202(1); Vt Stat Ann, tit 20, § 1(a); Va Code Ann 44-146.14(a) and Va Code Ann 44-146.16; Wash Rev Code 38.52.010 and Wash Rev Code 38.52.020(1); W Va Code 15-5-1; Wis Stat 323.10; Wy Stat Ann 19-13-103(a) and Wy Stat Ann 35-4-115(a)(i); see also Nev Rev Stat 414.0335 and Nev Rev Stat 414.0345 (the governor did not cite specific statutes in the COVID-19 declaration of emergency but instead broadly invoked the "laws" of the state—these statutes allow emergency declarations for public-health events).

## III. CONSTITUTIONAL DOUBT

If, after all this, I had any lingering doubts about the meaning of the statute, then, as plaintiffs point out, I would still be forced to choose the narrower interpretation. That is because it avoids the grave constitutional questions raised by the Governor's exceedingly broad reading of the statute. " 'When the validity of an act . . . is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.' " *Workman v Detroit Auto Inter-Ins Exch*, 404 Mich 477, 508; 274 NW2d 373 (1979), quoting *Ashwander v Tennessee Valley Auth*, 297 US 288, 348; 56 S Ct 466; 80 L Ed 688 (1936). This principle, known as the constitutional-doubt canon, "rests on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts." *Clark v Martinez*, 543 US 371, 381; 125 S Ct 716; 160 L Ed 2d 734 (2005).[18]

---

In the remaining few states, the respective governors have invoked statutes that at least arguably define emergencies or disasters with enough breadth to cover public health. See Neb Rev Stat 81-829.39(2) and (3) (defining "emergency" and "disaster" to mean, in relevant part, "any event or the imminent threat thereof causing serious damage, injury, or loss of life or property resulting from any natural or manmade cause"); Mo Rev Stat 44.010 (defining emergencies to include natural disasters that affect the "safety and welfare" of the residents, including things like bioterrorism); NH Stat 21-P:35(VIII) (defining "state of emergency" as a "condition, situation, or set of circumstances deemed to be so extremely hazardous or dangerous to life or property that it is necessary and essential to invoke, require, or utilize extraordinary measures, actions, and procedures to lessen or mitigate possible harm").

[18] This rule of interpretation is often invoked alongside a separate rule of judicial procedure: the rule of constitutional avoidance. See *Reading Law*, p 251. The latter rule is also deeply rooted in our constitutional jurisprudence. See *Powell v Eldred*, 39 Mich 552, 553 (1878) ("It is a cardinal principle with courts not to pass upon the constitutionality of acts of the Legislature, unless where necessary to a determination of the case."). Courts should be

24

Here, plaintiffs claim that the statute, under the Governor's interpretation, would violate the separation of powers by improperly delegating legislative authority and by failing to articulate standards to guide the Governor's exercise of the statutory power. Our Constitution divides the powers of government among the three branches and states that "[n]o person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution." Const 1963, art 3, § 2.

As I explain below, I believe that if the Governor's and the majority's interpretation is correct, then the EPGA is in trouble. The spin the Governor and the majority give the statute allows her to wield staggering powers across the entire terrain of our lives and our laws. And once declared, an emergency ends only when she says it ends. Until then, the Governor has vast powers. Using these powers here, she has unilaterally suspended statutes and determined which businesses can open, what they can sell, and how they can sell it; which homes residents can use; whether and how people socialize; what outdoor

reluctant—and indeed should refuse—"to undertake the most important and the most delicate of the Court's functions . . . until necessity compels it in the performance of constitutional duty." *Rescue Army v Muni Court of Los Angeles*, 331 US 549, 569; 67 S Ct 1409; 91 L Ed 1666 (1947). The rule of constitutional avoidance protects the separation of powers. See *id*. at 570 (noting that the rule is "basic to the federal system and this Court's appropriate place within that structure"); *id*. at 571 (noting that the rule is founded on, among other things, "the necessity, if government is to function constitutionally, for each to keep within its power, including the courts"). Indeed, we have said that the "avoidance of unnecessary constitutional issues" is a core aspect of "judicial power." *Nat'l Wildlife Federation v Cleveland Cliffs Iron Co*, 471 Mich 608, 614-615; 684 NW2d 800 (2004), rev'd on other grounds by *Lansing Sch Ed Ass'n, MEA/NEA v Lansing Bd of Ed*, 487 Mich 349 (2010); see also *Mich Citizens for Water Conservation v Nestlé Waters North America Inc*, 479 Mich 280, 292-293; 737 NW2d 447 (2007) (citing *Nat'l Wildlife*'s definition of "judicial power" and stating that preservation of the separation of powers depends on the judiciary confining itself to this definition), rev'd on other grounds by *Lansing Sch*, 487 Mich 349.

25

recreation is acceptable; what medical services individuals can obtain; and much more besides.[19] All of this raises serious doubts about the statute's constitutionality. Indeed, below I explain that, assuming the Governor and the majority are correct on what the statute means, I agree with the majority that the EPGA constitutes an unconstitutional delegation of legislative power. But I would avoid these determinations by adopting the more reasonable (and, in my opinion, clearly correct) interpretation above.

## IV. RESPONSE TO THE MAJORITY

By focusing on ordinary meaning, the majority opinion fails to seriously consider the fundamental principle that "[w]ords are to be understood in their ordinary, everyday meanings—*unless* the context indicates that they bear a technical sense." See *Reading Law*, p 69 (emphasis added). It is true that "[i]nterpreters should not be required to divine arcane nuances or to discover hidden meanings" and that "we should not make [interpretation] gratuitously roundabout and complex." *Id*. at 69-70. And it is also true, as I have pointed out elsewhere, that " '[o]ne should assume the contextually appropriate ordinary meaning unless there is reason to think otherwise.' " *In re Erwin Estate*, 503 Mich 1, 33 n 15; 921 NW2d 308 (2018) (VIVIANO, J., dissenting), quoting *Reading Law*, p 70. But, as Scalia and Garner are quick to point out, "[s]ometimes there *is* reason to think otherwise, which ordinarily comes from context." *Reading Law*, p 70.

---

[19] See Governor Gretchen Whitmer, *MI Safe Start: A Plan to Re-Engage Michigan's Economy* (May 7, 2020), available at <https://www.michigan.gov/documents/whitmer/MI_SAFE_START_PLAN_689875_7.pdf> (accessed October 1, 2010) [https://perma.cc/CM42-6JDS]; Executive Order Nos. 2020-4, 2020-5, 2020-6, 2020-14, 2020-17, and 2020-21.

As the authors explain, in somewhat elementary fashion, "[e]very field of serious endeavor develops its own nomenclature—sometimes referred to as *terms of art*," and "[s]ometimes context indicates that [this] technical meaning applies." *Id*. at 73. This is not a new principle. See, e.g., 1 Kent, Commentaries on American Law (1826), p 432 ("The words of a statute are to be taken in their natural and ordinary signification and import; and if technical words are used, they are to be taken in a technical sense."). It is deeply embedded in our law. See MCL 8.3a ("All words and phrases shall be construed and understood according to the common and approved usage of the language; but technical words and phrases, and such as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning.").

The majority ignores the obvious contextual clues that inexorably lead to the conclusion that "public safety" is a term of art—i.e., it is an object of the police power and is referenced in a statute that explicitly delegates the police power to the Governor. Instead, the majority rejects the technical meaning without any serious analysis by asserting in conclusory fashion that the statute is "common" and "clear" and by rejecting such "fine" distinctions in a case of this magnitude.

But that is not all. As described above, by reading "public safety" according to the ordinary meanings of its two words, the majority opinion ignores the statutory context and renders the entire phrase "when public safety is imperiled" nugatory. This disregards yet

27

another widely accepted and routinely applied canon of interpretation: the surplusage canon.[20]

Perhaps most troubling—in a case in which the majority endeavors to protect the separation of powers—is the majority's disregard of yet another fundamental and longstanding interpretive rule: the constitutional-doubt canon. Although I believe my reading of the EPGA is the most reasonable interpretation of the statute, even if I were inclined to accept the Governor's interpretation, courts have an obligation to go further to see if "a construction of the statute is fairly possible by which the question may be avoided." *Workman*, 404 Mich at 508 (quotation marks and citation omitted). The majority opinion not only overlooks basic interpretive principles in the first instance, but it also fails to take a second look to see if there is another reasonable construction of the statute. This failure to grapple with the constitutional-doubt canon deprives the majority of an indispensable interpretive tool that functions both to uncover the meaning of statutory text and also to respect separation-of-powers principles by "minimiz[ing] the occasions on which [the courts] confront and perhaps contradict the legislative branch." *Reading Law*, p 249.

---

[20] The majority opinion also finds it significant that I was the first to raise the question of whether "public safety" should be interpreted as a legal term of art when I did so at oral argument and notes that plaintiffs "effectively conceded" this argument. However, the Court requested supplemental briefing on the issue, and all parties and amici have had an opportunity to be heard on this issue. In any event, the Court is certainly not bound by the concession. Compare *Bisio v The City of the Village of Clarkston*, ___ Mich ___, ___; ___ NW2d ___ (2020) (Docket No. 158240) (adopting an interpretation of a statute favoring a party contrary to that party's concession when the issue was raised at the eleventh hour by amicus, the issue was not addressed at oral argument, and the parties were not given an opportunity for supplemental briefing).

I would not suspend the sound principles of interpretation that have guided our interpretive efforts for centuries for this or any case. Instead, I would give the EPGA its fair meaning, as outlined above.

## V. DELEGATION

It should be abundantly clear by now that I do not believe we need to reach the constitutional question in this case because the statute simply does not apply. But six justices disagree, and so my interpretation is not binding. Instead, the interpretation that now governs reads the EPGA to cover nearly everything under the sun, thus bringing the delegation issue into focus. This is, moreover, a certified-question case in which we are presented two discrete issues, one of which involves delegation. Therefore, I consider it my duty to answer whether the EPGA, as construed by the majority, constitutes an impermissible delegation of legislative powers.[21]

I fully agree with and join the majority's analysis and conclusion that the EPGA is an unconstitutional delegation. I write only to explain why, in an appropriate future case, I would consider adopting the approach to nondelegation advocated by Justice Gorsuch in *Gundy v United States*, 588 US ___, ___; 139 S Ct 2116, 2131; 204 L Ed 2d 522 (2019) (Gorsuch, J., dissenting). The framework he advanced is firmly grounded in history and makes short work of the modern view, illustrated by the Chief Justice's "*any* standards"

---

[21] Cf. *Jefferson Co v Acker*, 527 US 423, 448; 119 S Ct 2069; 144 L Ed 2d 408 (1999) (Scalia, J., concurring in part and dissenting in part) ("For the foregoing reasons, I would hold that this case was improperly removed. In view, however, of the decision of a majority of the Court to reach the merits, I join Parts I, III, and IV of the Court's opinion. Cf. *Edgar v. MITE Corp.*, 457 U.S. 624, 646, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982) (Powell, J., concurring in part); *United States v. Jorn*, 400 U.S. 470, 488, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971) (Black, J., concurring in judgment).").

test here, that a legislature can cede immense power to the executive so long as it sprinkles in a few vague adjectives that a court can pass off as standards.

As Justice Gorsuch stated, the core principle underlying the nondelegation doctrine—and one that is enshrined in our own Constitution, Const 1963, art 3, § 2—is that the Legislature simply may not " 'delegate . . . powers which are strictly and exclusively legislative.' " *Gundy*, 139 S Ct at 2133 (Gorsuch, J., dissenting), quoting *Wayman v Southard*, 23 US (10 Wheat) 1, 42-43; 6 L Ed 253 (1825). Lawmaking, the framers of the federal Constitution believed, should be difficult because it poses dangers to liberty; thus, federal statutes require passage by two legislative bodies and approval by the executive to become law. *Id*. at 2134. Our own Constitution, of course, reflects these same requirements. Const 1963, art 4, §§ 26 and 33. And throughout our constitutional history, especially near the beginning of our statehood, the same fears of excessive lawmaking by the legislative branch were prevalent. See, e.g., Campbell, *Judicial History of Michigan* (1886), p 44 (noting that the 1850 Constitution contained a "number of provisions which seem to indicate that it was supposed the people could not trust their agents and representatives"); see generally Shugerman, *The People's Courts: Pursuing Judicial Independence in America* (Cambridge: Harvard University Press, 2012), pp 6, 123-143 (describing popular distrust of legislatures in the mid-nineteenth century).

The strict requirements for legislation would mean nothing, Justice Gorsuch observed, if the legislative branch "could pass off its legislative power to the executive branch . . . ." *Gundy*, 588 US at ___; 139 S Ct at 2134 (Gorsuch, J., dissenting). More important still, these hedges against hasty lawmaking and the separation of powers were not an experiment designed to preserve "institutional prerogatives or governmental turf";

30

they were, instead, meant to "respect[] the people's sovereign choice to vest the legislative power" in one branch alone and to "safeguard[] a structure designed to protect their liberties, minority rights, fair notice, and the rule of law." *Id*. at 2135. So when a court throws up its hands and says an airy standard like "reasonableness" is enough to make a delegation proper, the court is not simply letting the Legislature recalibrate its institutional interests—it is allowing the Legislature to pass off responsibility for legislating, thereby endangering the liberties of the people, as the present case has vividly demonstrated.[22]

How, then, are courts to discern improper delegations? Justice Gorsuch offered three standards covering the circumstances in which delegations are permissible. "First, we know that as long as Congress makes the policy decisions when regulating private conduct, it may authorize another branch to 'fill up the details.' " *Id*. at 2136. This standard comes from United States Supreme Court Chief Justice Marshall, who, in an early decision, "distinguished between those 'important subjects, which must be entirely regulated by the legislature itself,' and 'those of less interest, in which a general provision may be made, and the power given to those who are to act . . . to fill up the details.' " *Id*., quoting *Wayman*, 23 US (10 Wheat) at 31, 43. We have similarly recognized that "[t]he leaving of

---

[22] In outlining the problems that would arise in such a scenario, Justice Gorsuch described a situation eerily similar to the present case:

> Without the involvement of representatives from across the country or the demands of bicameralism and presentment, legislation would risk becoming nothing more than the will of the current President. And if laws could be simply declared by a single person, they would not be few in number, the product of widespread social consensus, likely to protect minority interests, or apt to provide stability and fair notice. [*Gundy*, 588 US at ___; 139 S Ct at 2135 (Gorsuch, J., dissenting).]

31

details of operation and administration" to the executive "is not an objectionable delegation of legislative power." *People v Babcock*, 343 Mich 671, 680; 73 NW2d 521 (1955); see also *Argo Oil Corp v Atwood*, 274 Mich 47, 52; 264 NW 285 (1935) ("It is too well settled to need the citation of supporting authorities that the Legislature, within limits defined in the law, may confer authority on an administrative officer or board to make rules as to details, to find facts, and to exercise some discretion, in the administration of a statute. The difficulty is in determining whether the limits are sufficiently defined to avoid delegation of legislative powers.").

"Second," Justice Gorsuch continued, "once Congress prescribes the rule governing private conduct, it may make the application of that rule depend on executive fact-finding." *Gundy*, 588 US at ___; 139 S Ct at 2136 (Gorsuch, J., dissenting). For example, a statute might impose trade restrictions on another country if the President determines that that country has taken or not taken certain actions. *Id*. Once again, our caselaw contains this same standard. See *Argo Oil Corp*, 274 Mich at 52; see also *Tribbett v Marcellus*, 294 Mich 607, 615; 293 NW 872 (1940) ("While the legislature cannot delegate its power to make a law, nevertheless it can enact a law to delegate a power to determine a fact or a state of things upon which the application of the law depends.").

In fact, we have noted that "for many years this and other courts evaluated delegation challenges in terms of whether a legislative (policymaking) or administrative (factfinding) function was the subject of the delegation . . . ." *Blue Cross & Blue Shield of Mich*, 422 Mich at 51. But we jettisoned this more restrained and historically grounded test in favor of the regnant "standards" test, i.e., the "intelligible principle" test. *Id*. Why? Not because this new test better reflected the Constitution's original meaning or historical

practice. Rather, we adopted the new position because we deemed the "standards" test to reflect the "essential purpose of the delegation doctrine" and because we better liked the consequences of this new test, i.e., that the Legislature could gather "the resources and expertise of agencies and individuals to assist the formulation and execution of legislative policy." *Id*. These are not considerations that normally justify a constitutional interpretation. See *Citizens Protecting Michigan's Constitution v Secretary of State*, 503 Mich 42, 59; 921 NW2d 247 (2018) (the object of constitutional interpretation is uncovering the text's original public meaning); *Tyler v People*, 8 Mich 320, 333 (1860) ("The expediency or policy of the statute has nothing to do with its constitutionality[.]"). As Justice Gorsuch described, the same mutation occurred in federal law, whereby a stray statement about intelligible principles "began to take on a life of its own" and eventually overwhelmed the traditional tests. *Gundy*, 588 US at ___; 139 S Ct at 2138-2140 (Gorsuch, J., dissenting).

Finally, the third realm of permissible delegation is the assignment of nonlegislative tasks to the executive (or judicial) branches. *Id*. at 2137. Almost by definition, if the delegated authority is not legislative, but already falls within the scope of executive authority, then no improper delegation has occurred. Our earlier caselaw similarly reflects this view. See, e.g., *People v Collins*, 3 Mich 343, 415-416 (1854) ("That the legislature may confer upon others, in their discretion, *administrative* powers necessary or proper for carrying on the government, not otherwise vested by the constitution, and in some cases involving the exercise of a discretion which the legislature itself might, but could not conveniently have exercised, no one will question. These, however, are not the law-making powers, and therefore do not here require particular notice. . . . *But the power of enacting*

33

*general laws cannot be delegated—not even to the people*. There is nothing in the constitution which authorizes or contemplates it; nothing in the nature of the power which requires it; nothing in the usages of our American government which sanctions it; no single adjudication of a court of last resort, in any state, which affirms it; and such delegation would be contrary to the intent manifested by the very structure of the legislative department of the government.").

Our holding today could be explained through this traditional framework. The power the Governor holds under the EPGA is no mere "filling in the details." Nor could the EPGA be thought of as a fact-finding statute or a grant of nonlegislative power. Instead, the EPGA bestows upon the Governor pure lawmaking authority, precisely what the separation of powers is designed to prevent.

No one in this case has requested that we consider the analytical framework sketched by Justice Gorsuch. It is, however, a possible path toward a nondelegation doctrine that reflects the original public meaning of *our* Constitution—every version of which contains more explicit language bearing upon nondelegation than does our federal counterpart.[23] Thus, if the issue is properly presented in a future case, I would consider

---

[23] See 1963 Const, art 3, § 2 ("No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution."); 1908 Const, art 4, § 2 ("No person belonging to 1 department shall exercise the powers properly belonging to another, except in the cases expressly provided in this constitution."); 1850 Const, art 3, § 2 (same); 1835 Const, art 3, § 1 ("[O]ne department shall never exercise the powers of another, except in such cases as are expressly provided for in this constitution."). See Cooley, Constitutional Limitations (1868), p 116 ("One of the settled maxims in constitutional law is, that the power conferred upon the legislature to make laws cannot be delegated by that department to any other body or authority.").

whether, and to what extent, we should adopt this framework.[24]  But in the present matter, I fully concur with the majority's holding that the EPGA constitutes an unconstitutional delegation of legislative power.

## V.  CONCLUSION

As discussed above, I believe that this case can be resolved on statutory grounds. In particular, I do not believe that the EPGA applies to public-health events like pandemics. Because my colleagues disagree and proceed to decide the constitutional issue, I consider it my duty to reach that issue as well.  I agree with and join the majority's analysis and holding that the EPGA represents an unconstitutional delegation of legislative authority. To my mind, the case also raises a larger point that the Court would do well to examine in an appropriate case: does the current "standards" test in the nondelegation doctrine reflect our Constitution's original public meaning?  For now, however, I fully agree with the majority's articulation and application of the current standard here.  I also agree with the majority's holding as to the EMA.  For these reasons, I join Parts III(A), (B), (C)(2), and IV of the majority opinion and concur in part and dissent in part.

David F. Viviano

---

[24] The Chief Justice apparently disagrees with this framework and asserts that it is based on "armchair history."  Others disagree.  See Wurman, *Nondelegation at the Founding*, 130 Yale L J (forthcoming), abstract, available at <https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3559867#> (accessed October 1, 2020) [https://perma.cc/PVG7-8Y3M] (refuting the attempt by Professors Julian Mortenson and Nicholas Bagley to "challenge the conventional wisdom that, as an originalist matter, Congress cannot delegate its legislative power").

STATE OF MICHIGAN

SUPREME COURT

---

*In re* CERTIFIED QUESTIONS FROM
THE UNITED STATES DISTRICT
COURT, WESTERN DISTRICT OF
MICHIGAN, SOUTHERN DIVISION

---

MIDWEST INSTITUTE OF HEALTH,
PLLC, d/b/a GRAND HEALTH
PARTNERS, WELLSTON MEDICAL
CENTER, PLLC, PRIMARY HEALTH
SERVICES, PC, and JEFFERY GULICK,

        Plaintiffs,

v

        No. 161492
        USDC-WD: 1:20-cv-414

GOVERNOR OF MICHIGAN, MICHIGAN
ATTORNEY GENERAL, and MICHIGAN
DEPARTMENT OF HEALTH AND
HUMAN SERVICES DIRECTOR,

        Defendants.

---

MCCORMACK, C.J. (*concurring in part and dissenting in part*).

Every eighth-grade civics student learns about the separation of powers and checks and balances—design features of our government to prevent one branch from accumulating too much power. The principle of separation of powers is fundamental to democracy. As James Madison put it: "The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many . . . may justly be pronounced

the very definition of tyranny." The Federalist No. 47 (Madison) (Rossiter ed, 1961), p 301.

In this light, the Legislature's delegation of authority to the Governor in the Emergency Powers of the Governor Act (the EPGA), MCL 10.31 *et seq.*, may appear concerning at a superficial glance, given that it vests the Governor, and the Governor alone, with the authority to exercise the whole of the state's police power in some emergencies. But our job is to apply the law. And all our precedent (and that of the United States Supreme Court) vindicates the Legislature's choice to delegate authority to the Governor in an emergency.

That does not insulate the Governor's exercise of that authority from checks and balances. To the contrary, there are many ways to test the Governor's response to this life-and-death pandemic.

Some of these are judicial. For example, the statute allows a legal challenge to the Governor's declaration that COVID-19, as a threshold matter, constitutes a "great public crisis" that "imperil[s]" "public safety." MCL 10.31(1). For another example, any order issued under the statute could be challenged as not "necessary" or "reasonable" to "protect life and property or to bring the emergency situation within the affected area under control." *Id*. In these ways and others, the courts can easily be enlisted to assess the exercise of executive power, measuring the adequacy of its factual and legal bases against the statute's language.

There are legislative mechanisms available too. The Legislature might revisit its longstanding decision to have passed the EPGA. If the Legislature saw fit, it could repeal

2

the statute. Or, the Legislature might amend the law to alter its standards or limit its scope. Changing the statute provides a ready mechanism for legislative balance.

What is more, Michigan's citizens can initiate petition drives to repeal the EPGA (and they are) and to recall the Governor (and they are), exercising yet other constitutional safeguards to curb executive overreach. Citizens by petition could alternatively amend the statute. And with or without a citizens' petition, the Governor undoubtedly will be politically accountable to voters for her actions in our next gubernatorial election, the ultimate check.

Not content with available constitutional devices and unwilling to acknowledge the limitations expressed by the EGPA's terms, the majority forges its own path. It announces a new constitutional rule to strike down a 75-year-old statute passed to address emergencies. In so doing, the majority needlessly inserts the Court into what has become an emotionally charged political dispute. Because our precedent does not support the majority's decision, because I would not make new rules to address a once-in-a-century global pandemic, and because there are many other remedies available to curb executive overreach, I respectfully dissent in part.[1]

---

[1] I concur in the majority's opinion to the extent that it concludes that we should answer the certified questions; holds that the Governor's executive orders issued after April 30, 2020, were not valid under the Emergency Management Act (the EMA), MCL 30.401 *et seq*.; and rejects the plaintiffs' statutory arguments that the EPGA does not authorize the Governor's executive orders. I therefore concur in Parts III(A) and (B) and all but the last paragraph of Part III(C)(1) of the majority opinion.

## I. THE NONDELEGATION DOCTRINE

As the majority observes, "[s]tatutes are presumed to be constitutional, and courts have a duty to construe a statute as constitutional unless its unconstitutionality is clearly apparent." *Taylor v Gate Pharm*, 468 Mich 1, 6; 658 NW2d 127 (2003). In *Dep't of Natural Resources v Seaman*, 396 Mich 299, 309; 240 NW2d 206 (1976), this Court adopted a three-pronged standard for evaluating whether a statute has provided sufficient standards for the delegation of legislative power to be constitutional. First, the act in question must be read as a whole. Second, the standard must be as reasonably precise as the subject matter requires or permits. And third, if possible, the statute must be construed in a way that renders it valid, not invalid; as conferring administrative, not legislative, power; and as vesting discretionary, not arbitrary, authority. The second prong is at the center of this dispute.

In applying this standard, we have consistently upheld statutes with broad and indefinite delegations of legislative authority. See, e.g., *G F Redmond & Co v Mich Securities Comm*, 222 Mich 1, 7; 192 NW 688 (1923) (concluding that the statutory term "good cause" for revocation of a license was "sufficiently definite" to constitute an adequate standard); *Smith v Behrendt*, 278 Mich 91, 93-94, 96; 270 NW 227 (1936) (upholding a statute that delegated the authority to grant permits to operate otherwise-prohibited oversize vehicles on public highways "in special cases"); *State Highway Comm v Vanderkloot*, 392 Mich 159, 172; 220 NW2d 416 (1974) (holding that " 'necessity' is an adequate standard in the context of delegated eminent domain authority" and noting that " '[n]ecessity' is also a recognized standard guiding administrative bodies in making other discretionary determinations based upon delegated legislative authority").

The United States Supreme Court takes a similar approach: a delegation of legislative authority is valid if it provides an " 'intelligible principle' " to guide the decision-maker's authority. *Mistretta v United States*, 488 US 361, 372; 109 S Ct 647; 102 L Ed 2d 714 (1989), quoting *J W Hampton, Jr & Co v United States*, 276 US 394, 409; 48 S Ct 348; 72 L Ed 624 (1928). Under this standard, the United States Supreme Court has approved of "broad standards" for congressional delegation of legislative power. *Mistretta*, 488 US at 373. There is a reason for this: "Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Id*. at 372. Using such delegations, "Congress gives its delegee the flexibility to deal with real-world constraints in carrying out his charge." *Gundy v United States*, 588 US ___, ___; 139 S Ct 2116, 2130; 204 L Ed 2d 522 (2019) (opinion by Kagan, J.).

The United States Supreme Court has only invalidated a statute under the nondelegation doctrine in two cases, both from 1935. *Panama Refining Co v Ryan*, 293 US 388; 55 S Ct 241; 79 L Ed 446 (1935); *ALA Schechter Poultry Corp v United States*, 295 US 495; 55 S Ct 837; 79 L Ed 1570 (1935). By contrast, the Court has "over and over upheld even very broad delegations" of authority in numerous cases spanning various decades. *Gundy*, 588 US at ___; 139 S Ct at 2129 (opinion by Kagan, J.). For a far-from-exhaustive list, see *Gundy*, 588 US at ___; 139 S Ct at 2129 (opinion by Kagan, J.); *id*. at 2131 (Alito, J., concurring in the judgment); *Whitman v American Trucking Associations, Inc*, 531 US 457, 472; 121 S Ct 903; 149 L Ed 2d 1 (2001); *Mistretta*, 488 US at 379; *United States v Mazurie*, 419 US 544, 556-557; 95 S Ct 710; 42 L Ed 2d 706 (1975); *United States v Sharpnack*, 355 US 286, 296-297; 78 S Ct 291; 2 L Ed 2d 282 (1958); *American Power & Light Co v Securities & Exch Comm*, 329 US 90, 104-106; 67 S Ct 133; 91 L Ed

5

103 (1946); *Yakus v United States*, 321 US 414, 425-426; 64 S Ct 660; 88 L Ed 834 (1944); *Mulford v Smith*, 307 US 38, 47-49; 59 S Ct 648; 83 L Ed 1092 (1939); *J W Hampton, Jr & Co*, 276 US at 409-411; *United States v Grimaud*, 220 US 506, 516-517, 521; 31 S Ct 480; 55 L Ed 563 (1911); *Marshall Field & Co v Clark*, 143 US 649, 693-694; 12 S Ct 495; 36 L Ed 294 (1892); *Wayman v Southard*, 23 US (10 Wheat) 1; 6 L Ed 253 (1825). Thus, the current state of the law is such that a successful nondelegation challenge in that Court is very hard to come by.[2]

Both Courts have tests that require *some* standards for the delegation of legislative authority—in theory, an inadequate standard would be insufficient. But until today, the United States Supreme Court and this Court have struck down statutes under the nondelegation doctrine only when the statutes contained *no* standards to guide the decision-maker's discretion. See *Mistretta*, 488 US at 373 n 7 (discussing *Panama Refining Co* and *ALA Schechter Poultry Corp*); *Blue Cross & Blue Shield of Mich v Milliken*, 422 Mich 1,

---

[2] *Gundy* suggests that some members of the current United States Supreme Court are prepared to revisit the doctrine in a future case. Justice VIVIANO finds Justice Gorsuch's approach potentially persuasive and suggests we might adopt it in a future case. But for now, Justice Gorsuch's approach is not the law, and *Panama Refining Co* and *ALA Schechter Poultry Corp* remain the only nondelegation challenges that have succeeded in that Court. And it is armchair history to suggest that the founding generation believed that the constitutional settlement imposed restrictions on the delegation of legislative power or that it empowered the judiciary to police the Legislature's delegations. As Professors Bagley and Mortenson have shown, the overwhelming majority of Founders didn't see anything wrong with delegations as a matter of legal theory. See Mortenson & Bagley, *Delegation at the Founding*, 121 Columbia L Rev (forthcoming 2021), available at <https://originalismblog.typepad.com/the-originalism-blog/2020/01/julian-davis-mortenson-nicholas-bagley-delegation-at-the-founding-with-a-response-from-ilan-wurmanmi.html> (accessed October 1, 2020) [https://perma.cc/9BF5-8SUX]; see generally Novak, *The People's Welfare: Law and Regulation in Nineteenth-Century America* (Chapel Hill: The University of North Carolina Press, 1996).

52; 367 NW2d 1 (1985) (agreeing with the plaintiff that the statute at issue contained " 'absolutely no standards' "); *Osius v St Clair Shores*, 344 Mich 693, 700; 75 NW2d 25 (1956) (invalidating an ordinance giving a zoning board of appeals authority to approve or deny the erection of gas stations but providing no standards to guide its decisions). The bar for what standards qualify as constitutional is low.

The delegation in the EPGA plainly has standards that surmount that bar. For the Governor to invoke the EPGA, her actions must be "reasonable" and "necessary," they must "protect life and property" or "bring the emergency situation . . . under control," and they may be taken only at a time of "public emergency" or "reasonable apprehension of immediate danger" when "public safety is imperiled." MCL 10.31(1). Those are standards. Reasonable people might disagree about their rigor, but this Court and the United States Supreme Court have consistently held similar standards constitutional. Until today, a delegation was invalid only when there were *no* standards. *Panama Refining Co*, 293 US 388; *Blue Cross & Blue Shield of Mich*, 422 Mich 1.

It is not my view that only delegations with no standards are unconstitutional. But until today this Court and the United States Supreme Court upheld every delegation that had some standards to guide the decision-maker's discretion. The particular standards in the EPGA are as reasonably precise as the statute's subject matter permits. Given the unpredictability and range of emergencies the Legislature identified in the statute, it is difficult to see how it could have been more specific. Indeed the EPGA contains *multiple* limitations on the Governor's authority, each limitation requiring more of the Governor

7

when exercising authority.[3] Therefore, our precedent holds that it does not violate the nondelegation doctrine.

The majority believes that *Whitman* provides the foundation for its decision that a delegation as broad as this one requires more specific standards guiding the Governor's discretion. But *Whitman* cannot bear the weight that they place on it. *Whitman* does state

---

[3] The majority concludes otherwise by asserting that the EPGA contains only the limitations that the Governor's actions be "reasonable" and "necessary," but as the majority notes, the United States Supreme Court has observed that the word "necessary" may be *part* of a sufficient standard imposed upon the executive branch. *Touby v United States*, 500 US 160; 111 S Ct 1752; 114 L Ed 2d 219 (1991).

So too here. The EPGA does not use "reasonable" or "necessary" in a vacuum; the Governor's action must be "reasonable" or "necessary" to "protect life and property or to bring the emergency situation within the affected area under control." What more important objectives does a Governor have in an emergency than to protect life and property and bring the emergency situation under control? And given the variety, breadth, and scope of potential emergencies, how much more specific could the Legislature have been in setting the standards guiding the Governor's discretion to accomplish those goals? Far from "illusory," as the majority calls them, these standards are specifically targeted to allow the Governor to remedy the dire consequences flowing from the emergency. For that reason, the United States Supreme Court precedent discussed in the majority opinion that holds that a "necessity" or some comparable standard might not have been sufficient in and of itself, but was enough when coupled with some criterion, applies to the EPGA. In other words, the authority that the majority cites says the statute is constitutional. The majority's discussion of those cases also contradicts its claim that the standards in the EPGA are confined to "reasonable" or "necessary." For example, the majority admits that the standard in *New York Central Securities Corp v United States*, 287 US 12; 53 S Ct 45; 77 L Ed 138 (1932), was not simply confined to the "public interest" but also included "adequacy of transportation service," "essential conditions of economy and efficiency," and "appropriate provision and best use of transportation facilities" because those terms supplied some criterion. But the majority fails to recognize that the EPGA similarly contains some criterion when it states that the Governor's orders must be necessary to "protect life and property or to bring the emergency situation within the affected area under control." MCL 10.31(1).

8

(sensibly) that the degree of discretion that is acceptable varies according to the scope of the power conferred. But it then sets broad parameters that can't be cast aside here:

> [E]ven in sweeping regulatory schemes we have never demanded, as the Court of Appeals did here, that statutes provide a "determinate criterion" for saying "how much [of the regulated harm] is too much." In *Touby* [*v United States*, 500 US 160; 111 S Ct 1752; 114 L Ed 2d 219 (1991)], for example, we did not require the statute to decree how "imminent" was too imminent, or how "necessary" was necessary enough, or even—most relevant here— how "hazardous" was too hazardous. [*Whitman*, 531 US at 475 (citation omitted).]

And the *Whitman* Court *upheld* the delegation in that case. Thus, even in a "sweeping" law (like the EPGA), the United States Supreme Court's rules have said—and ours were in accordance until today—that the standards provided are enough to guide the Governor's exercise of her discretion.[4]

The majority reaches a contrary conclusion only by breaking new ground in our nondelegation jurisprudence. And what is its justification for doing so? Essentially this— the scope of the Governor's power under the EPGA is unprecedented, so we need a new nondelegation rule to contain it. But creating new constitutional doctrine to respond to a

---

[4] The majority finds some light in the language from *Synar v United States*, 626 F Supp 1374, 1386 (D DC, 1986), that "[w]hen the scope increases to immense proportions . . . the standards must be correspondingly more precise." *Synar*, of course, is not binding on us or any other court outside the DC Circuit, and it cited no authority for its claim. Why we would (or should) rely on that standard, which has no support in our law or that of the United States Supreme Court, is anyone's guess. But if we were to rely on it, it cuts against the majority's assertion that the duration of the delegation in the EPGA makes it unconstitutional. See *id*. at 1386-1387 (stating that "while extremely limited duration has been invoked as one of the elements sustaining a delegation, lengthy duration has never been held to render one void" and noting that "[t]he delegations upheld in [*J W Hampton, Jr & Co*, 276 US at 394], and [*Marshall Field & Co*, 143 US at 649] . . . were for indefinite terms").

9

problem that has many other solutions puts the Court in a precarious position. If, as Aristotle said, "the law is reason free from passion," an emotionally charged case seems like a terrible candidate for making new law. When there is a settled rule that has been in place for decades, discarding it to respond to an outlier case (especially when there are other solutions available) is imprudent.

Breaking new constitutional ground here to facially invalidate the EPGA is unnecessary because there are other judicial remedies. If the citizens of this state believe that the Governor has overstepped, they can challenge her determination that this public-health crisis is an emergency that imperils public safety and seek a declaration that she no longer has the authority to act under the EPGA.[5] Or those aggrieved by her orders can challenge any or all of them. (Indeed, that's exactly what the plaintiffs here did.) If any order is not reasonable and necessary because it is not directed at protecting life and property or bringing the emergency situation under control, or not issued at a time of public emergency or reasonable apprehension of immediate danger that imperils public safety, it will fall. There are justiciable questions as to whether the Governor can continue to declare

---

[5] When the Governor issued the initial state of emergency back in March and a very real danger existed of hospitals being overrun with COVID-19 patients or running out of ventilators and personal-protection equipment, there was a specific set of facts to justify her declaration that the pandemic was a disaster that threatened public safety. Whether she can make a persuasive case that a disaster threatening public safety continues today is a question a court could decide. Resolving the Governor's authority to act under the EPGA by adjudicating such a challenge rather than striking the act altogether (an act that the Legislature believed gave the Governor necessary and important tools for combatting emergencies) would be a more modest use of our judicial power. I therefore strongly disagree with the majority that the Governor's powers under the EPGA are of indefinite duration. And for that same reason, I don't view the lack of a specific durational limitation in the EPGA as "considerably broaden[ing] the scope of authority" conferred by the statute.

an ongoing emergency and invoke the EPGA generally, as well as to the propriety of specific individual executive orders.[6]

Political remedies abound too. The people could convince their elected representatives to repeal (or amend) the EPGA, or attempt to do so themselves. Indeed, a petition to repeal the EPGA is circulating, and recent news reports suggest that it may already have enough signatures to proceed. See, e.g., Hermes & Booth, *Michigan Group Surpasses Signatures Needed for Petition Against Gov. Whitmer's Emergency Powers* (September 14, 2020), available at <https://www.clickondetroit.com/news/michigan/2020/09/14/group-gathers-signatures-to-petition-against-gov-whitmers-emergency-powers/> (accessed October 1, 2020) [https://perma.cc/98ZL-REE8]. Not to mention the most potent political remedy of all: the ballot box. If citizens are unhappy with the Governor's actions, they can launch a petition to recall her (and again, at least one is already circulating)—or vote against her in the next election.

Our nondelegation jurisprudence does not support the majority's decision to facially invalidate the EPGA. And the availability of other remedies makes this case a poor vehicle for reshaping the law. I dissent from the majority's sweeping constitutional ruling.[7]

---

[6] Of course, separation-of-powers disputes do not *always* involve political questions to be avoided by the judiciary (the majority's straw man offering). *This* separation-of-powers dispute is best resolved by the many other remedies available (including judicial remedies) before facially invalidating the EPGA.

[7] I also question whether the facial validity of the EPGA is properly before the Court, even though I concede that is how the federal court presented the issues to us. The plaintiffs in

Finally, the plaintiffs seek a declaration prohibiting the defendants from enforcing Department of Health and Human Services orders issued by defendant Director Robert Gordon. Those orders proclaim to draw their authority not from the EMA or EPGA but from MCL 333.2253. The federal district court did not certify to this Court any question regarding the validity of those orders, and this Court does not offer any opinion on the validity or continued enforcement of those orders.

---

the federal district court sought only as-applied relief. See Plaintiffs' Complaint (May 12, 2020) at 35-36, requesting the following relief:

> a. A declaratory judgment that the Provider Plaintiffs are permitted under Executive Order 2020-17, Executive Order 2020-77, and the HHS order to continue their business operations and Mr. Gulick is permitted under Executive Order 2020-17, Executive Order 2020-77, and the HHS order to obtain knee replacement surgery and other vital medical treatment;
>
> b. Alternatively, a declaration that Executive Order 2020-17 and Executive Order 2020-77, as applied to the Plaintiffs, violates the Michigan Constitution, the Fourteenth Amendment, and the Commerce Clause of the United States Constitution;
>
> c. Preliminary and permanent injunctive relief preventing the Defendants from enforcing Executive Order 2020-17, Executive Order 2020-77, and the HHS order against the Plaintiffs;
>
> d. Damages for the violation of the Plaintiffs' constitutional rights, in an amount to be proven at trial;
>
> e. Costs and expenses of this action, including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988; and
>
> f. Any further relief that the Court deems appropriate.

Yet the federal district court certified to this Court the question whether the Governor has the authority under the EPGA or EMA after April 30, 2020, to issue *any* executive order related to the COVID-19 crisis.

## II. CONCLUSION

I agree with the majority that the Governor's executive orders issued after April 30, 2020, were not valid under the EMA. But I dissent from its holding that the EPGA is facially unconstitutional under the nondelegation doctrine. I would uphold the EPGA as a valid delegation of legislative authority under our settled jurisprudence.

> Bridget M. McCormack
> Richard H. Bernstein
> Megan K. Cavanagh

STATE OF MICHIGAN

SUPREME COURT

---

*In re* CERTIFIED QUESTIONS FROM
THE UNITED STATES DISTRICT
COURT, WESTERN DISTRICT OF
MICHIGAN, SOUTHERN DIVISION

---

MIDWEST INSTITUTE OF HEALTH,
PLLC, d/b/a GRAND HEALTH
PARTNERS, WELLSTON MEDICAL
CENTER, PLLC, PRIMARY HEALTH
SERVICES, PC, and JEFFERY GULICK,

      Plaintiffs,

v

                                         No. 161492
                                         USDC-WD: 1:20-cv-414

GOVERNOR OF MICHIGAN, MICHIGAN
ATTORNEY GENERAL, and MICHIGAN
DEPARTMENT OF HEALTH AND
HUMAN SERVICES DIRECTOR,

      Defendants.

---

BERNSTEIN, J. (*concurring in part and dissenting in part*).

Like Chief Justice MCCORMACK, whose separate opinion I join in full, I concur in the majority's opinion in part but dissent from its ultimate holding that the Emergency Powers of the Governor Act (EPGA), MCL 10.31 *et seq.*, is unconstitutional. I write separately to express how I came to this difficult conclusion.

The Centers for Disease Control and Prevention report that, in the United States, there have been more than 7,000,000 confirmed cases of COVID-19, and more than

200,000 associated deaths.[1]  This data confirms that the United States is the worldwide leader in both confirmed cases and deaths.[2]  In Michigan alone, there have been more than 100,000 confirmed cases of COVID-19, and more than 6,000 associated deaths.[3]  Although many of the measures enacted by executive order have led to the containment of these numbers in Michigan, history warns us that deadlier second or third waves may still await us.[4]

In short, the situation we all are facing is tremendously grave.  COVID-19 has posed and continues to pose a very real threat to both the lives and livelihoods of everyone in Michigan.  This is, of course, an understatement to everyone who has lost a loved one or their very way of life.  We are truly experiencing a global health crisis of unprecedented scope, and the fact that the Governor of Michigan has attempted to curb the threat by issuing executive orders is understandable.  However, as my fellow Justices have

---

[1] Centers for Disease Control and Prevention, *COVID Data Tracker* <https://covid.cdc.gov/covid-data-tracker/#cases_casesinlast7days> (accessed September 30, 2020) [https://perma.cc/9BCR-6CAL].

[2] World Health Organization, *Coronavirus Disease (COVID-19) Dashboard* <https://covid19.who.int/> (accessed September 30, 2020) [https://perma.cc/ME95-PTFZ].

[3] Michigan, *Coronavirus* <https://www.michigan.gov/coronavirus/> (accessed September 30, 2020) [https://perma.cc/Z2NE-XRLE].

[4] "The first pandemic influenza wave appeared in the spring of 1918, followed in rapid succession by much more fatal second and third waves in the fall and winter of 1918–1919, respectively . . . ."  Taubenberger & Morens, *1918 Influenza: The Mother of All Pandemics*, 12(1) Emerg Infect Dis 15, 16 (2006), available at <https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3291398/> (accessed September 30, 2020).

2

recognized, it is not our role to consider or debate the practicality of any of these measures—instead, our job is to determine whether the Governor had the legal authority to act in the first place.

The separation of powers is one of the fundamental principles of our form of government.[5]  As one of the Framers put it:

> If angels were to govern men, neither external nor internal controls on government would be necessary.  In framing a government which is to be administered by men over men, the great difficulty lies in this: you must first enable the government to control the governed; and in the next place oblige it to control itself.  [The Federalist No. 51 (Madison) (Rossiter ed, 1961), p 322.]

Our entire government is built on the understanding that a system of checks and balances between the branches is necessary for a fully functioning democracy.  Our interest in policing the boundaries between the separate branches of government is more than merely academic.  I am reminded of a passage in the Bible, which reads, "Now there arose a new king over Egypt, who did not know Joseph."  Exodus 1:8.  It is this concern over a new king that propels my unease here.  It is not enough to be content with how a *specific*

---

[5] "The Framers recognized that, in the long term, structural protections against abuse of power were critical to preserving liberty."  *Seila Law LLC v Consumer Fin Protection Bureau*, 591 US ___, ___; 140 S Ct 2183, 2202; 207 L Ed 2d 494 (2020), quoting *Bowsher v Synar*, 478 US 714, 730; 106 S Ct 3181; 92 L Ed 2d 583 (1986).  " 'There can be no liberty where the legislative and executive powers are united in the same person, or body of magistrates' . . . ."  The Federalist No. 47 (Madison) (Rossiter ed, 1961), p 302, quoting Montesquieu.  "Even a cursory examination of the Constitution reveals the influence of Montesquieu's thesis that checks and balances were the foundation of a structure of government that would protect liberty.  The Framers provided a vigorous Legislative Branch and a separate and wholly independent Executive Branch, with each branch responsible ultimately to the people."  *Bowsher*, 478 US at 722.

individual may be wielding their power.  Instead, we are concerned with the inherent authority to act, because in our system of government, leaders may come and go depending on the will of the electorate.  That a specific leader can be credited with acting in good faith does not prevent a successor from behaving differently.  It can only help sharpen our understanding of how best to protect our democracy to think about how an unknown future actor might exercise this authority and what concerns that might raise.[6]

That said, after a thorough examination of prior caselaw from both this Court and the Supreme Court of the United States, I agree with Chief Justice MCCORMACK that the grant of power found in the EPGA does not offend the separation of powers.  To be clear, I find this conclusion inherently troubling.  Again, we are a government of checks and balances, and at first blush, it seems more than a little strange that a delegation of this scope could be constitutionally appropriate.  However, as Justice Alito recently acknowledged, "[S]ince 1935, the [Supreme Court of the United States] has uniformly rejected nondelegation arguments and has upheld provisions that authorized agencies to adopt important rules pursuant to extraordinarily capacious standards." *Gundy v United States*, 588 US ___, ___; 139 S Ct 2116, 2130-2131; 204 L Ed 2d 522 (2019) (Alito, J., concurring

---

[6] See Somin, *Obama's Constitutional Legacy*, 65 Drake L Rev 1039, 1041-1046 (2017); Prokop, Vox, *How Barack Obama Is Expanding Presidential Power – and What It Means for the Future* <https://www.vox.com/2014/9/9/5964421/obama-lawsuit-republicans-abuse-of-power> (posted September 9, 2014) (accessed September 30, 2020) ("So future Republic presidents will inevitably cite the new precedents Obama is setting to justify actions of their own.  'I think Democrats are going to rue the day they did not push back against Obama on these things,' says [Mitchel] Sollenberger, the University of Michigan professor [of Political Science].  'Just as Republicans regretted the same thing when they didn't push back against Bush.' ").

in the judgment).[7] Consistent with decades of jurisprudence from both this Court and the Supreme Court of the United States, I therefore agree with Chief Justice MCCORMACK that the nondelegation doctrine, as it is currently understood, is ill-suited to address the unique problem placed before us now. As Justice Alito noted:

---

[7] For years, legal commentators have noted that the nondelegation doctrine does very little work. Eskridge & Ferejohn, *The Article I, Section 7 Game*, 80 Geo L J 523, 561 (1992) ("Although contrary to the Framers' apparent understanding in 1789, we agree with *Mistretta* [*v United States*, 488 US 361; 109 S Ct 647; 102 L Ed 2d 714 (1989),] that the nondelegation is essentially unenforceable as a constructional doctrine."); Wilkins & Hunt, *Agency Discretion and Advances in Regulatory Theory: Flexible Agency Approaches Toward the Regulated Community as a Model for the Congress-Agency Relationship*, 63 Geo Wash L Rev 479, 541 (1995) (stating that "the New Deal-era nondelegation decisions have seemed virtually toothless since 1935 . . . ."); Young, *The Constitution Outside the Constitution*, 117 Yale L J 408, 446 (2007) ("For example, Congress's ability to shift lawmaking responsibility to the executive branch was once limited by the nondelegation doctrine, which permitted shifting implementation functions to agencies but insisted that Congress make the basic policy decisions by articulating an 'intelligible principle' to guide agency discretion. But the courts found the concept of excessive delegation very difficult to define and police, and they eventually gave up trying."); Watts, *Rulemaking as Legislating*, 103 Geo L J 1003, 1016 (2015) ("So how is it that the Court continues to insist pursuant to the nondelegation doctrine's central premise that Congress may not delegate legislative power while, at the same time, Congress routinely delegates broad rulemaking powers to federal agencies and enables agencies to promulgate legislative rules on wide-ranging subjects that carry the force and effect of law? The answer lies in what is known as the intelligible principle requirement—a requirement that might sound substantial but, in reality, is quite toothless.") See also *Gundy*, 588 US at ___ n 62; 139 S Ct at 2140 n 62 (Gorsuch, J., dissenting).

To the extent that this commentary is understood to be limited to a federal context, this Court has also noted that application of the intelligible-principle requirement has led to "uniformly unsuccessful" delegation challenges since the New Deal era. *Taylor v Gate Pharm*, 468 Mich 1, 9; 658 NW2d 127 (2003). "In Michigan, this Court has considered similar claims regarding statutes where the claims included an allegation of improperly delegating the Legislature's power to a Michigan agency, and we have rejected the claims on a basis similar to the federally developed rationale." *Id*. at 10.

If a majority of this Court were willing to reconsider the approach we have taken for the past 84 years, I would support that effort. But because a majority is not willing to do that, it would be freakish to single out the provision at issue here for special treatment. [*Id.* at 2131.]

Given that this Court considers its understanding of the nondelegation doctrine to be similar to that of the Supreme Court of the United States,[8] I would continue to apply the standards test that this Court has consistently used to analyze nondelegation challenges.[9] Because I agree with Chief Justice MCCORMACK that a straightforward application of that test leads to the conclusion that the EPGA satisfies the constitutional principle of the separation of powers, I would leave to the Supreme Court of the United States to decide whether it is now time to revisit the nondelegation doctrine.

To conclude, as I do, that Governor Whitmer has the legal authority to issue orders under the EPGA would not prevent the people of Michigan from otherwise expressing their frustrations with the COVID-19 orders. Efforts to repeal the EPGA are already underway. As with all elected officials, the Governor herself is politically accountable to the electorate, via the recall process or at the next gubernatorial election.[10] The enforcement

---

[8] See *Taylor*, 468 Mich at 10.

[9] See *Westervelt v Natural Resources Comm*, 402 Mich 412, 439-440; 263 NW2d 564 (1978).

[10] As Alexander Hamilton has stated in referring to executive power, "it is far more safe there should be a single object for the jealousy and watchfulness of the people[.]" The Federalist No. 70 (Hamilton) (Rossiter ed, 1961), p 430. This appears to have been borne out in practice, as the Board of State Canvassers notes that 20 recall petitions against Governor Whitmer have been filed in 2020 alone. Michigan Secretary of State, Board of State Canvassers, *2020 Recall Petitions Submission and Status*, available at <https://www.michigan.gov/documents/sos/2020_BSC_Recall_Petitions_v2_703097_7.pdf> (accessed on September 30, 2020) [https://perma.cc/X4AD-ZAH2].

of individual executive orders could and has already been challenged, as evidenced in the underlying case before us, as not being "reasonable" or "necessary to protect life and property." MCL 10.31(1).[11] As a hypothetical example, Executive Order No. 2020-180 states:

> [A]thletes training for, practicing for, or competing in an organized sport must wear a facial covering (except when swimming) or consistently maintain 6 feet of social distance (except for occasional and fleeting moments). For example, an athlete participating in a football, soccer, or volleyball game would not be able to consistently maintain 6 feet of distance, and therefore would need to wear a facial covering.

One could mount a challenge to the enforcement of this order in a region with a lower incidence of COVID-19, as a mask mandate might not be necessary to protect life and property under those circumstances. The very duration and scope of the executive orders could also be challenged under the same language, as some of the more invasive restrictions may no longer be reasonable or necessary if a vaccine were to be widely distributed or if a spike of infections were to be successfully flattened. All of these options would remain available to the people of Michigan even if this Court concluded that the Governor had the authority to issue orders under the EPGA.

In conclusion, on the basis of settled caselaw from this Court and the Supreme Court of the United States, I would hold that the EPGA does not offend the nondelegation doctrine, and I would leave to the people of Michigan the right to mount challenges to individual orders issued under the EPGA.

Richard H. Bernstein

---

[11] See also *Dep't of Health & Human Servs v Manke*, 505 Mich ___; 943 NW2d 397 (2020).